Robert L. Brace, SBN 122240
HOLLISTER & BRACE
P.O. Box 630
Santa Barbara, CA 93102
Telephone: (805) 963-6711
Facsimile: (805) 965-0329
Email: rlbrace@hbsb.com

*Attorneys for Thomas Dillon, as Court-
Appointed Receiver for Vesta Strategies, LLC*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THOMAS DILLON, as Court-Appointed Receiver for Vesta Strategies, LLC<br><br>                    Plaintiff,<br><br>vs.<br><br>MURPHY & HOURIHANE, LLC, an Illinois Limited Liability Company.<br><br>                    Defendant | **Case No.:**<br><br>**COMPLAINT FOR:**<br><br>   **1.   LEGAL MALPRACTICE;**<br><br>   **2.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; AND**<br><br>   **3.   FRAUDULENT CONVEYANCE**<br><br>**JURY DEMAND** |

## TABLE OF CONTENTS

Page No.

I.   JURISDICTION AND VENUE ................................................. 1

II.  SUMMARY OF RECEIVER'S CLAIM AGAINST M&H ................................ 1

III. PARTIES AND RELEVANT NON-PARTIES ...................................... 3

    A.   Plaintiff ........................................................ 3

    B.   Defendant ........................................................ 4

    C.   Relevant Non-Parties ............................................. 4

IV.  THE BUSINESS OF 1031 EXCHANGES ........................................ 5

V.   GENERAL ALLEGATIONS REGARDING THE CONSPIRACY TO STEAL CLIENT EXCHANGE FUNDS ....................................................... 7

VI.  M&H RESCINDED THE U.S. FIRE INSURANCE POLICIES WHICH COVERED OWNER THEFT OF CLIENT FUNDS ................................ 9

    A.   The Need to Compete ........................................... 9

    B.   The U.S. Fire Policies Covered Owner Theft of Client Exchange Funds ...... 10

    C.   Enforcement of the Policies Was Not Against Public Policy As Long As the Exchangers Receive the Money and The Insurer May Sue the Thieves Who Stole the Money ................................................. 12

VII. THERE WOULD HAVE BEEN $4 MILLION IN COVERAGE UNDER THE U.S. FIRE POLICIES BUT FOR M&H'S RESCISSION ................................ 15

VIII. MALPRACTICE ALLEGATIONS AGAINST M&H ................................ 16

IX.  INFORMATION ALLEGATIONS ............................................. 18

X.   NOTICE OF RELATED CASES TO SHOW THAT INSURANCE CODE § 533 WAS NOT IMPLICATED ................................................ 18

XI.  CAUSES OF ACTION .................................................... 19

XII. PRAYER FOR RELIEF ................................................... 20

XIII JURY DEMAND ......................................................... 21

i

# I.

## JURISDICTION AND VENUE

1. This legal malpractice action is within the **diversity jurisdiction** of the Federal Court because it is between citizens of different states and the amount in controversy exceeds $75,000.

2. Defendant Murphy & Hourihane, LLC ("M&H") is a limited liability company formed under the laws of the State of Illinois and is a citizen of Illinois. M&H was the law firm which represented Vesta Strategies, LLC on failed exchanges and advised its client on insurance matters in California.

3. Vesta Strategies LLC ("Vesta") is a California limited liability company, with its principal place of business in Santa Clara County, California. Vesta is a citizen of California. Vesta's office and employees were located in Santa Clara County. Vesta entered into its insurance contracts (which are the subject matter of this malpractice litigation) with United States Fire Insurance Company ("U.S. Fire") in Santa Clara County. Vesta is in receivership and acts through its duly appointed Receiver.

4. Plaintiff Thomas Dillon ("Dillon"), as the Receiver for Vesta, is a citizen of California. Dillon brings this action solely in his capacity as the Receiver for Vesta.

5. **Venue** is appropriate in the Northern District of California, and more particularly in the San Jose Division because Vesta operated its place of business in Santa Clara County, the insurance issued to Vesta in San Jose by U.S. Fire would have paid for losses incurred here, and M&H acted as the attorneys for Vesta in California when M&H negotiated with exchangers over their failed exchanges and then rescinded the U.S. Fire Policies, which would have provided relief for the same exchangers.

# II.

## SUMMARY OF THE RECEIVER'S CLAIMS AGAINST M&H

6. Dillon is the Federal Court-Appointed Receiver of Vesta. Vesta owes, at a minimum, $10 million to Vesta exchangers or their subrogees for stolen exchange funds. Vesta possessed $4 million in insurance coverage issued by U.S. Fire which covered stolen exchange

1    funds.   M&H traded $40,000 in returned premiums from U.S. Fire, in exchange for the

2    rescission of $4 million in insurance, to the detriment of Vesta and its creditors.

3          7.      John Terzakis ("Terzakis") and Robert Estupinian ("Estupinian"), as members

4    of Vesta, owned Vesta.  Vesta acted as 1031 "qualified intermediary" in California holding

5    exchange funds deposited by clients in trust.  Vesta purchased $4 million dollars of insurance

6    from United States Fire Insurance Company ("U.S. Fire") which covered the theft of exchange

7    funds by the "member" owners of Vesta. Over several years and policy periods, Terzakis and

8    Estupinian looted approximately $20,000,000 in client exchange funds on deposit at Vesta.

9    After stealing the money, Terzakis and Estupinian ran a Ponzi[1] scheme by convincing new

10   1031 exchangers to deposit their exchange funds at Vesta so that Terzakis and Estupinian

11   could take the money to pay off older Exchanges which could not fund because that money

12   had been previously stolen.  Terzakis and Estupinian were indicted for their crimes, plead

13   guilty and are in prison.

14         8.      Effective August 19, 2005, U.S. Fire issued a $2 million Commercial Crime

15   Policy, number 626-030096-4 to Vesta Strategies, LLC for the period from August 19, 2005,

16   to August 19, 2006 (the "2005-2006 policy").  Effective July 19, 2006, U.S. Fire issued a $2

17   million Commercial Crime Policy, number 626-030403-3 to Vesta Strategies, LLC for the

18   period from July 19, 2006 to July 19, 2007 (the "2006-2007 policy"). Collectively the 2005-

19   2006 policy and the 2006-2007 policy will be referred to as the "U.S. Fire Policies."

---

21   [1] QIs who pay older 1031 Exchanges with after-acquired funds when the trust is in a
22   deficit operate a Ponzi scheme which is a fraud. See *Taxel v. Vaca* (*In re San Diego Realty
     Exch., Inc.*), 132 B.R. 424, 429 (Bankr. S.D. Cal. 1991), rev'd on other grounds, sub. nom. Taxel
23   v. Surnow, 132 B.R. 424, 1994 U.S. App. LEXIS 10317 (9th Cir. Cal. May 2, 1994). Even when
     a QI does not start out as a Ponzi scheme, once [the company] mismanaged and converted the
24   funds of some clients, and kept taking in the business and assets of others, it quickly became
     that." *Manty v. Miller & Holmes, Inc.* (*In re Nation- Wide Exch. Servs.*), 291 B.R. 131, 149 n. 20
25   (Bankr. D. Minn. 2003) (stating that this case could be termed a "resulting Ponzi scheme or
     Ponzi schemes by performance"). The very nature of a Ponzi scheme guarantees that the persons
26   who are harmed are not those who deposit money in the beginning, but those who make their
     deposits right before the collapse. Courts recognize that the Ponzi scheme itself presupposes
27   proximate causation (or foreseeability) because the intent to defraud future undertakers can be
     inferred as a matter of law. *Emerson v. Maples* (*In re Mark Benskin & Co.*), 1995 U.S. App.
28   LEXIS 16053, *12-13 (6th Cir. Tenn. June 26, 1995); *Merrill v. Abbott* (*In re Indep. Clearing
     House Co.*), 77 B.R.843, 860 (D. Utah 1987).

9.      The U.S. Fire Policies provided coverage to Vesta for owner theft of exchange funds discovered during the policy periods and reported to U.S. Fire as soon as possible after discovery. The "member" owners of Vesta (Terzakis and Estupinian), along with an employee of Vesta (Ye), stole over $4 million in exchange funds on deposit at Vesta during the U.S. Fire Policies periods.  Each theft of exchange funds created a deficit in the trust account and caused injury to the trust established by Vesta.  Each theft would be a covered loss under the U.S. Fire Policies.

10.     The U.S. Fire Policies issued to Vesta are not claims made policies.  The policies are loss discovery policies which require notice to be given to U.S. Fire as soon as possible after discovery of the loss.  Terzakis and Estupinian prevented the tender of claims of their own thefts to U.S. Fire.  The adverse domination by Terzakis and Estupinian ended when Dillon was appointed Receiver of Vesta on December 16, 2009 and made the claim to U.S. Fire.  The time to make the claim was tolled because of the adverse domination by Terzakis and Estupinian.  Dillon made the claim to U.S. Fire which was rejected, because M&H, as the attorneys for Vesta, accepted $40,000 from U.S. Fire to rescind $4 million dollars worth of U.S. Fire Policies.  M&H accepted the $40,000 because Terzakis owed it fees.  M&H rescinded the U.S. Fire Policies as the attorneys for Vesta.  Recession of the policies did not benefit Vesta and was a breach of duty owed to Vesta by both Terzakis and M&H.  A copy of the Order Appointing Dillon as Receiver is attached as **Exhibit 1**. Copies of the two U.S. Fire Policies are attached hereto as **Exhibit 2**.  A copy of the M&H rescission letter dated June 1, 2009 is attached hereto as **Exhibit 3**.

**III.**

**PARTIES AND RELEVANT NON-PARTIES**

**A.   Plaintiff**

11.     On December 16, 2009, the Court entered an Order appointing **Thomas Dillon as the Receiver of Vesta Strategies, LLC.**  On December 22, 2009, the Receiver's Oath and Affirmation were filed.  On June 13, 2010, the Court approved the Receiver's Bond.  On September 26, 2010, the Court entered an Order appointing the firm of Hollister & Brace as

counsel to the Receiver. Thomas Dillon as the Receiver for Vesta is the Plaintiff. Prior to the appointment of Dillon as the Receiver for Vesta, Vesta was adversely dominated by its owners (Terzakis and Estupinian) who were committing fraud and embezzlement against Vesta. The adverse domination by the Thieves rendered Vesta incompetent and without physical or mental capacity to fend for itself by knowing the fraud was being committed or acting to protect itself in response. Vesta's incapacity was eliminated upon the appointment of Dillon, as a fiduciary, on December 16, 2009.

12. **Vesta Strategies, LLC ("Vesta")** is a two-member California limited liability company. Its members are B & B Sparco Properties (controlled by Terzakis) and Mutual Vision, LLC (controlled by Robert and Ginny Estupinian). Through B & B Sparco Properties, Terzakis holds a 51% majority interest in Vesta, and the Estupinians, through Mutual Vision, LLC, hold a 49% minority interest. Vesta maintained its principal place of business in San Jose, California, with offices located at 150 Almaden Boulevard, Suite 135. The control of Vesta's finances by Terzakis and Estupinian was so complete as to preclude non-wrongdoing employees from discovering the misconduct of Terzakis and Estupinian.

**B.** **Defendant**

13. Defendant **Murphy & Hourihane, LLC (M&H)** is an Illinois limited liability company. M&H's representation of Vesta in California started in 2008 and continued past June of 2009. On June 1, 2009, M&H rescinded the U.S. Fire Policies on behalf of Vesta to the detriment of Vesta. Prior to June 1, 2009, M&H was negotiating with exchangers over their failed exchanges at Vesta -- exchanges that could have been funded with the U.S. Fire insurance.

**C.** **Relevant Non-Parties**

14. **John D. Terzakis ("Terzakis")** was convicted of felony fraud charges arising out of his operation of a 1031 Ponzi scheme involving Vesta while Vesta was insured by U.S. Fire. Terzakis is a 51% majority "member" owner of Vesta. Terzakis had access to exchange funds deposited at Vesta and he, with the assistance of Peter Ye (an employee at Vesta), exploited his position to advance his own personal interests at the expense of Vesta, and to the

damage of the exchangers doing business with Vesta.  Terzakis embezzled **millions** in client exchange funds during the periods of the U.S. Fire Policies.

15. **Robert E. Estupinian ("Estupinian")** was convicted of felony fraud charges with Terzakis. Estupinian owns 49% of Vesta through his entity, Mutual Vision, LLC. Estupinian was employed by Vesta as its Chief Executive Officer. Estupinian has been a partner with Terzakis since 2000, and he started Vesta with Terzakis in 2004.  Estupinian had access to exchange funds deposited at Vesta.  Similar to Terzakis, Estupinian exploited his position to advance his personal interests at the direct expense of Vesta.  Estupinian, with the assistance of Peter Ye (an employee at Vesta), embezzled **millions** in client exchange funds during the terms of the U.S. Fire Policies.

16. Illegal transfers by Terzakis and Estupinian of exchange funds deposited at Vesta occurred during the terms of each of the two U.S. Fire Policies, triggering coverage for each policy period.  The exact amounts stolen from Vesta by Terzakis and Estupinian up to the policy limit for each policy period will be proven at the time of trial.

17. **Peter C.Y. Ye ("Ye")** pled guilty to wire fraud. Ye was the acting Vice President of Operations at Vesta and an employee.  As an employee of Vesta, Ye managed the bank accounts at Vesta where exchange funds were deposited.

18. Ye knew that Terzakis (a member-owner and manager) and Estupinian (a member-owner and CEO) were embezzling exchange funds. Nevertheless, Ye, as an employee of Vesta, while acting in collusion with Terzakis and then Estupinian, assisted Terzakis and Estupinian in the embezzlement of exchange funds.

## IV.

## THE BUSINESS OF 1031 EXCHANGES

19. Section 1031 of the Internal Revenue Code permits owners of investment property to defer capital gains taxes that would otherwise be due upon the sale of the property.  The deferral is conditioned upon the timely purchase of replacement investment property (a "1031 Exchange").  In a typical 1031 exchange, an exchanger (the "exchanger") sells a parcel of real property and has 45 days to identify "replacement" property, and 180 days to close on

the purchase of the "replacement" property.  To defer taxes, the exchanger may not take possession of the sale proceeds.  For this reason, qualified intermediaries ("QIs") or exchange accommodators ("Exchange Accommodators") were established to take possession and hold the funds in trust while substitute property was purchased by the client. The use of a QI in connection with a 1031 Exchange is a "safe harbor" for the taxpayer to avoid actual or constructive receipt.

20.     The responsibilities and obligations that a QI owes an exchanger are set forth in a contract (an "Exchange Agreement").  In the Exchange Agreement, the exchanger assigns his/her/its rights in the proceeds from the "relinquished" property, to the QI until the money is applied towards the acquisition of the "replacement" property.  Although legal title to the funds ("exchange funds") is transferred to the QI, the exchanger retains all rights in the proceeds except for the use and benefit of the money during the exchange period.  The exchange period can be simultaneous or up to 180 days.  The exchange funds are held in trust by the intermediary acting in the capacity of a trustee for the exchanger (the beneficiary of the trust).

21.   QIs charge a fee. Generally, the fee includes a portion of the interest earned on the exchange funds which are to be invested in safe fiduciary accounts.

22.   The business of 1031 exchanges is graphically depicted below:

## 1031 EXCHANGE

SELLER ⟶ BUYER

Qualified Intermediary (QI)
Receives exchange funds
(that would otherwise go to Seller)

exchange funds

QI

QI holds
exchange funds in trust

exchange funds
used to
close escrow on
Replacement Property

45 days to identify
Replacement Property

Owner contracts to
sell his/her
relinquished property

Close of Relinquished
Property

180 days to close
The purchase of
Replacement Property

6

## V.

## GENERAL ALLEGATIONS REGARDING THE CONSPIRACY OF
## THE OWNERS OF VESTA TO STEAL CLIENT EXCHANGE FUNDS

23.     Terzakis and Estupinian (the "Thieves") first began working together in approximately March 2000, at which time they discovered the existence of the unregulated business of 1031 Exchange Accommodators, whereby large sums of money were held in trust for up to 180 days. With rising real estate prices, new escrows being opened on relinquished properties were sufficient to pay for the close of escrows on replacement properties, thus enabling them to divert exchange funds held in trust without detection by the exchangers.

24.     The Thieves formed Vesta to act as a QI for purposes of 1031 exchanges.  Other employees at Vesta were unaware of the theft of exchange funds.  Terzakis and Estupinian controlled the financial affairs of Vesta and exercised dominion over the QI which incapacitated Vesta and precluded non-wrongdoing employees from discovering their crimes.

25.     The Thieves carried out their scheme by utilizing an extensive network of banks and bank accounts located across the United States. For Vesta, the movement of money began with the deposit of client exchange funds in accounts established at East West Bank (headquartered in Pasadena, California). Once deposited into a legitimate depository account, the exchange funds were then transferred to Vesta accounts established at specific banks where the Thieves did much of their personal banking business. From these accounts, it was a simple matter for the Thieves to move the exchange funds into their own personal and business accounts as they pleased.

26.     Vesta used East West Bank as its initial depositor bank for its 1031 exchanges occurring in the western United States. Client deposits made at East West Bank were initially placed into segregated accounts opened for the specific purpose of receiving a client's individual exchange funds. There were over 440 individual deposit accounts established at East West Bank for this purpose.  The accounts gave the appearance of safeguarding client funds and satisfied the requirement in U.S. Fire's Policies that the exchange funds be segregated from the operating funds of Vesta.  A statement was provided to the client showing

1   the deposit was made. The client could see from the statement that the money was placed in a

2   segregated account, which gave the exchanger the impression that the money was safe. The

3   segregated deposit accounts at East West Bank were used by the Thieves as a means to

4   mislead clients and conceal the Ponzi scheme. The segregated deposit account satisfied the

5   conditions subsequent to the U.S. Fire Policies.

6        27.    Vesta also used Merrill Lynch Pierce Fenner & Smith ("Merrill Lynch") as its

7   financial institution for 1031 exchanges occurring in the eastern United States. The Merrill

8   Lynch accounts were at Mellon Bank. Once deposited in the Merrill Lynch accounts at Mellon

9   Bank, the exchange funds experienced the same fate as the exchange funds deposited at East

10   West Bank. Terzakis, Estupinian and Ye used the Merrill Lynch accounts as an initial place to

11   deposit the exchange funds of newer Vesta clients, such that the exchange funds could be

12   conveniently wired out to other accounts as Terzakis, Estupinian, and Ye pleased. The Merrill

13   Lynch accounts were also used by Terzakis and Estupinian to receive lulling payments back in

14   to Mellon Bank, for purposes of covering the exchanges of earlier clients and concealing their

15   ongoing theft. The Merrill Lynch accounts satisfied the conditions subsequent to coverage

16   under the U.S. Fire Policies issued to Vesta.

17        28.    The success of the scheme depended upon the Thieves' ability to mislead

18   Vesta's clients and non-wrongdoing employees regarding the safekeeping and use of exchange

19   funds, and to hide the ever worsening financial condition of the QI. They were able to

20   accomplish this in part with the help of Ye, who oversaw and orchestrated the flow of

21   exchange funds between accounts. With the boom in the real estate market, where new escrows

22   being opened on relinquished properties were sufficient to pay for the close of escrows on

23   replacement properties, the Thieves were able to continue the scheme undetected. During the

24   terms of the two U.S. Fire Policies, the Thieves were able to misappropriate, undetected,

25   millions of dollars in exchange funds. The scheme collapsed in late June 2008, coincidental

26   with the cooling of the real estate market.

27   ///

28

# VI.

## M&H RESCINDED THE U.S. FIRE INSURANCE POLICIES WHICH COVERED OWNER THEFT OF CLIENT FUNDS.

### A. The Need to Compete

29. The Federation of Exchange Accommodators ("FEA") is a trade organization established to promote the interests of QIs handling 1031 Exchanges. The FEA recognized a need for its members to better compete with banks and title companies, who also operate as QIs. In conjunction with Willis (an insurance broker) and Continental Casualty Company ("CNA"), the FEA developed an insurance program intended to boost consumer confidence in QIs by protecting exchange funds from theft by the owners of the QIs. The program involved the modification of a standard Commercial Crime Policy by means of several 1031 Tax-Deferred Exchange Endorsements.

30. The Tax-Deferred Exchange Endorsements expanded coverage beyond the scope of an ordinary Commercial Crime Policy which protects the insured employer from theft of the employer's property by a dishonest employee. The Tax-Deferred Exchange Endorsements guaranteed the fidelity of the QI and its owners as to the exchange funds on deposit with the insured QI. Although the FEA insurance was referred to industry-wide as a "Fidelity Bond Program" it was by definition a surety bond in that exchange funds on deposit with the QI were "bonded" from theft by the QI or owners of the QI.

31. To compete with CNA, U.S. Fire began issuing the same coverage under its own "Fidelity Bond Program" in exchange for substantial policy premiums. Vesta switched from coverage issued by CNA to the identical coverage issued by U.S. Fire.

32. Vesta's insurance portfolio with U.S. Fire was comprised of the following policies attached as **Exhibit 2**:

> (a) August 19, 2005 to August 19, 2006 Crime Policy (which was called a "Fidelity Bond") issued to Vesta by U.S. Fire in the amount of $2,000,000 (Policy number 626-030096-4);

> (b) July 19, 2006 to July 19, 2007 Crime Policy (which was called a "Fidelity Bond") issued to Vesta by U.S. Fire in the amount of $2,000,000 (Policy number 626-030403-3).

9

**B.**     **The U.S. Fire Policies Covered Owner Theft of Client Exchange Funds.**

33.     The Tax-Deferred Exchange Endorsements contained in the U.S. Fire Policies were drafted and used with the intent to protect exchange funds deposited at Vesta from theft by the owners of Vesta.

34.     Adam McDonough ("McDonough"), the CEO of the San Francisco office of Lockton Insurance Brokers, participated in drafting the Tax-Deferred Exchange Endorsement on behalf of the Federation of Exchange Accommodators ("FEA") in 1994 with Lori Davern of CNA (McDonough Dep. Vol. 1, 37:12-25).[2] McDonough's goal in drafting the Tax-Deferred Exchange Endorsement was to expand the scope of coverage in the Standard Commercial Crime Policy to protect client money from owner theft and his testimony follows:

**Testimony of Adam McDonough of Lockton Insurance Brokers**

**Question by Brace**: And conceptually the goal, as you understood it was, No. 1, to provide insurance protection for client money because you were aware that the 1031 exchange accommodator was holding other people's money?

**Answer by McDonough**:  That's right.

**Q.**   So one of the goals was to protect that money.  Right?

**A.**   That was one of the goals.

**Q.**   The other goal was to protect the QI's money, the actual entity's money?

**A.**   That's right.

---

[2] The deposition of Adam McDonough ("McDonough") was taken in the case styled *In Re Receivership of Southwest Exchange Litigation, Inc. and Consolidated Litigation,* Nevada District Court, Clark County Nevada Lead Case No. 07-A535439-B.  In that case, Adam McDonough of Lockton Insurance Brokers drafted the Tax-Deferred Exchange Endorsement (the "Endorsement") which was issued to Southwest Exchange, a qualified intermediary. The Endorsement was specifically created to: (1) include owner theft in relation to 1031 exchange transactions; and (2) include 1031 exchange property in the definition of "property."  U.S. Fire issued identical policies containing the same language (including the Endorsement) to both Southwest Exchange and Vesta.

1    **Q**.   And the third goal was to have this - - this insurance - - the existence

2         of this insurance assist the QI in competing with larger title companies

3         that had a QI as a division of the company?

4    **A**.  That's my recollection, yes.

5    (McDonough Dep., Vol. 1, 50:11-51:2)

6    **Q.**  So the effort that went in, in the beginning [1994] really produced the

7         endorsement that exists - - that exists up until 2006?

8    **A.**  For the most part.

9    **Q.**  Tell me how - - how it protects client money, how the endorsement

10        conceptually was supposed to protect client money.

11   **A**.   There were two elements that were intended to protect exchanger funds.

12        First was making an exception to the owner exclusion so that acts of owners,

13        when they involved a 1031 exchange transaction, would be covered by the

14        policy. The second change was the amendment to the definition of covered

15        property where we affirmatively stated in the endorsement that property of

16        an exchanger involved in a 1031 transaction is covered property under the

17        policy.

18   (McDonough Dep. Vol. 1, 79:18-80:11)

19   **Q.**  . . .essentially the first two concepts, the owner exclusion is removed and

20        client property is protected, those two concepts really are a very board

21        expansion of coverage, are they not?

22   **A.**  Yes.

23   **Q.**  Conceptually, the insurer really is basically insuring the honesty of the

24        owner with regards to the client property on deposit at the qualified

25        intermediary?

26   **A.**  Conceptually that's correct.

27   **Q.**  And that - - for millions - - theoretically, millions of dollars?

28   **A.**  Right.

**Q.** And that's a fairly aggressive leap of an insurance risk, is it not?

**A**. I would say it falls outside of the standard risk.

(McDonough Dep. Vol. 1, 83:17 - 84:12)

**Q.** And so in the grand scheme of things. . .when you look at the entity itself, the majority of the funds that the insurance is supposed to protect is client money and not the money of the exchange entity. Isn't that correct?

**A.** I agree that the exchange funds are the larger part of the risk.

**Q.** . . .the primary focus of this insurance was to protect the client money from the theft by the owner of the QI, was it not?

**A.** I can't speak to if that was the primary focus of every policyholder out there.

**Q.** No, but how about **your** conceptual primary purpose of the policy?

**A.** Okay. Yes, I'll agree.

(McDonough Dep. Vol. 1, 124:18-125:12) (emphasis added)

35. The U.S. Fire Policies issued to Vesta are not standard "first-party" commercial crime policies - they were "enhanced" policies modified by Tax-Deferred Exchange Endorsements which expanded coverage to protect exchange funds from theft by the owners of the QI, the named insured. The insured risk is not limited to the situation where an errant employee penetrates the financial protections implemented by the employer to protect his/her own money or money owed to others. The U.S. Fire Policies expand the scope of coverage to include protection of exchange funds belonging to clients of the QI from the intentional acts of theft and embezzlement by those persons in control of the QI including its owners and partners.

**C. <u>Enforcement of the Policies Was Not Against Public Policy As Long As The Exchangers Receive the Money And the Insurer May Sue the Thief Who Stole the Money</u>.**

36. The U.S. Fire Policies expressly covered owner theft of exchange funds. Enforcement of the U.S. Fire Policies by Dillon as the Receiver for Vesta did not benefit

Terzakis or Estupinian, the Thieves.  The $750,000 out of the $4,000,000 paid by U.S. Fire was isolated from the general assets of Vesta, used to recharge the trust accounts, and paid on a *pro-rata* basis solely to the exchangers who lost their exchange funds at the end of the Ponzi scheme.

37.      Christopher Barr, the underwriter at U.S. Fire, testified that if U.S. Fire paid for the theft of client funds by the owners of an insured QI (like Vesta), the insurer, as surety, could sue the Thieves, but client funds held in trust by the QI would be protected from the insurer's subrogation rights under the policy.  Christopher Barr explains how the policy works and why enforcement does not violate public policy:

### Testimony of Christopher Barr, Underwriter at U.S. Fire[3]

**Question by Brace:**  Well, tell me your understanding of how paragraph 3 [the surety subrogation clause] would work if the owner steals some client funds.

**Answer by Barr:**  If a loss occurs that is covered  . . . we would have the right, which we under many circumstances would not have, **to seek recovery against our own insured**.  (Emphasis added.)

**Q.** So if Southwest [Exchange] steals $100,000, and you have to pay $100,000, you get to go after Southwest [Exchange] for the $100,000?

**A.** If they had $100,000, we have the right to try and get it.

**Q.** But that would not include going after trust assets of Southwest Exchange which are the assets of the other depositors, isn't that right?

---

[3] The deposition of Christopher Barr ("Barr") was taken in the case styled *In Re Receivership of Southwest Exchange Litigation, Inc. and Consolidated Litigation,* Nevada District Court, Clark County Nevada Lead Case No. 07-A535439-B. In that case, U.S. Fire had insured Southwest Exchange ("SWX"), a qualified intermediary owned by Donald McGhan ("McGhan").  Barr's testimony concerning SWX applies equally to Vesta because: (1) Vesta and SWX were issued identical policies that contained the same language; and (2) both QIs were robbed of exchange funds from their owners: McGhan stole exchange funds from SWX, just like Terzakis stole exchange funds from Vesta.

**VESTA'S COMPLAINT AGAINST MURPHY & HOURIHANE, LLC**

1     **A.** That's true.  This is an indemnity policy, and any payment by us

2     under the policy would immediately flow to a Category C property

3     [client funds], and we would not be able to attach that to recover the loss

4     that we had paid to create the balance in that bank account.  So, yes, that

5     would be outside of our reach.

6     **Q.** A clear distinction in your mind between Southwest Exchange's

7     property and the clients of Southwest Exchange's property?

8     **A.** . . . what it is attempting to do is to create that distinction . . . What we

9     are trying to do here is establish a clear distinction, whatever the tax

10     legalities of the situation are, that this property has to be ring fenced and

11     treated like client property, whatever the legal niceties say.  And we will

12     also abide by that when it comes to applying the exclusion and when it

13     comes to recoveries.

14     **Q.** So Southwest Exchange steals $100,000 and makes a claim under the

15     policy.  Your check from U.S. Fire goes into the Southwest Exchange

16     general account or goes directly to the client or goes where?

17     **A.** That's a hypothetical I cannot answer.  At that point there are a lot of

18     facts that come into play.  When you say Southwest commits the act,

19     who?  Does it survive the commission of the act?  Is it in receivership?

20     There are obviously some steps that have to be taken to make sure that

21     we're not essentially paying the loss to the guy who stole the money in

22     the first place.

23     **Q.** . . . And so the goal of U.S. Fire would not be to pay the thieving

24     party?

25     **A.** Exactly.

26  (Barr Dep. 163:11-165:23.)

27  ///

28

**VESTA'S COMPLAINT AGAINST MURPHY & HOURIHANE, LLC**

38.     Dillon, the Receiver, settled with U.S. Fire for $750,000 on the $4 million in coverage because, in part, M&H had rescinded the U.S. Fire Policies.  Enforcement of the U.S. Fire Policies by Dillon as the Receiver for Vesta did not benefit Terzakis or Estupinian, the Thieves, because the money paid by U.S Fire was isolated from the QI's general assets, used to recharge the trust account, and paid on a *pro-rata* basis solely to exchangers who lost their exchange funds.  The public policy embodied in Insurance Code § 533 was in no way offended because U.S. Fire always had the right to seek subrogation from Vesta, Estupinian and Terzakis.  *National Technical Systems v. United Pacific Insurance Company*, 97  Cal.App. 4th 415 (2002).

## VII.

## THERE WOULD HAVE BEEN $4 MILLION IN COVERAGE UNDER THE
## U.S. FIRE POLICIES BUT FOR M&H'S RESCISSION.

39.     On July 14, 2011, the District Court denied U.S. Fire's motion to dismiss the counterclaim filed by Dillon seeking coverage.  A copy of the Order is attached hereto as **Exhibit 4**.  The Order (quoted, in part, below), sets forth the law against U.S. Fire if M&H had not rescinded the U.S. Fire Policies for no reason other than to get paid for fees owed by Terzakis.   In denying U.S. Fire's motion to dismiss, the U.S. District Court held that:

> In this case, the general policy that one should not be permitted to take advantage of his or her own wrong is not implicated by Counter-Claimant's adverse domination allegations. Should Counter-Claimant receive funds under the Policies for loss caused by Terzakis and Estupinian, Counter-Claimant is charged with maintaining a common fund for the payment of Vesta's creditors, including the exchangers from whom Terzakis and Estupinian stole. Thus, the Court finds that allowing recovery in this case will not provide Terzakis and Estupinian with the opportunity to take advantage of their own wrongdoing.

> Unlike the policy in <u>California Union</u>, the Tax-Deferred Exchange Endorsement of the Policies at issue expressly covers losses resulting from dishonest acts of the insured, Vesta, or its partners, Terzakis and Estupinian, involving Section 1031 exchange funds. **As a result, in this case, any embezzlement of Section 1031 exchange funds by company principles was expressly covered by the Policies.**

40.     Paragraph 3 of the U.S. Fire Policies provides that U.S. Fire, as the surety, is subrogated to the rights of the exchangers and, as a result, it can sue Vesta, Terzakis and Estupinian to recover any money it had to pay as the result of Terzakis and Estupinian's thefts. The language is as follows:

> 3.  Any loss paid (as well as any fees, costs or expenses incurred by us) as a result of the waiver of Exclusion D.1.a pursuant to paragraph 2 above, will be subject to all rights of recovery that we may have against you and your partners or "members." You and they, collectively and severally, agree to indemnify us immediately for all such loss, fees, costs and expenses.  The foregoing is in addition to any other rights we have under the law or under this policy.

41.     Paragraph 3 of the Tax-Deferred Exchange Endorsement eliminates any possible argument that enforcement of the U.S. Fire Policies would violate Insurance Code § 533.  Every dollar paid by U.S. Fire to recharge the trust is recoverable by U.S. Fire from the Thieves.  Terzakis and Estupinian could not benefit from enforcement of the policies.  The risk of loss is just shifted from the exchange funds held in trust to the insurer.  The insurer then seeks recoupment if it can from the person or persons who stole the exchange funds.

## VIII.

## MALPRACTICE ALLEGATIONS AGAINST M&H

42.     On November 2005, M&H was engaged by Terzakis to provide legal services to certain Terzakis' entities in litigation entitled Anderson Dundee 53, LLC et al. v. Manager Dundee 53, Inc. and Ilene 1500, LLC, et al. v. Tax Deferred Services, LLC, et al. (hereinafter the "Anderson Dundee Litigation").   The Anderson Dundee Litigation included allegations against Terzakis for fraud, breach of fiduciary duty and operating a Ponzi scheme.  M&H incurred substantial fees in the Anderson Dundee Litigation which remained unpaid by Terzakis.

43.     The real estate market peaked in the summer of 2006.  The decline caused liquidity issues for Terzakis as well as for Vesta.  By the fall of 2007, Vesta was unable to complete Exchanges which caused the delay in funding numerous Exchanges and a dispute arose between Terzakis and Estupinian on what to do.

44. On December 7, 2007, Terzakis caused Vesta to file a lawsuit against Estupinian entitled "Vesta Strategies, LLC v. Robert E. Estupinian, et al., case number 07-06126 JF (hereinafter the "Estupinian RICO Litigation.") Terzakis alleged in the Estupinian RICO Litigation that Vesta was damaged as the result of Estupinian' s ongoing theft of exchange funds during the periods of the U.S. Fire Policies. On April 9, 2008, Estupinian filed a Counterclaim against Terzakis in the Estupinian RICO Litigation which alleged that Terzakis was the 51% owner of Vesta and that it was Terzakis (and not Estupinian) who had stolen the exchange funds during the periods of the U.S. Fire Policies. M&H knew about the facts of this ongoing litigation between Terzakis and Estupinian over stolen exchange funds.

45. By the summer of 2008, M&H had been engaged by Terzakis to represent the interests of Vesta in the Estupinian RICO Litigation and to defend Vesta against claims by exchangers with failed exchanges. M&H had full knowledge that exchange funds were missing from Vesta and each owner of Vesta was accusing the other of stealing these funds.

46. Vesta collapsed in June of 2008. As of June 2008, M&H was counsel to Vesta representing Vesta against claims of theft brought by Vesta exchangers with unfunded exchanges. This was at the same time that Terzakis owed M&H fees for work already completed in the Anderson Dundee Litigation.

47. After June of 2008, U.S. Fire was placed on notice that claims would be asserted by Vesta Exchanges for the theft of the Vesta exchange funds by the owners of Vesta – Terzakis and Estupinian. On June 1, 2009, U.S. Fire tendered to M&H, as counsel to Vesta, $40,000 as the premium paid by Vesta for the two U.S. Fire Policies in exchange for Vesta's voluntary rescission of the $4 million in insurance coverage for owner theft of Client exchange funds.

48. On or about June 1, 2009, M&H, as counsel to Vesta, accepted the $40,0000 and rescinded the $4 million in coverage. The $40,000 paid to M&H was used by M&H to pay for fees outstanding and owed by Terzakis. A copy of the rescission letter is attached as **Exhibit 3**. Rescission of the U.S. Fire Policies by M&H damaged Vesta by the loss of the $4 million in coverage for owner theft of Client exchange funds. No reasonably prudent attorney,

17

1   representing the interest of Vesta, would have advised Vesta to rescind the policy or assisted

2   Terzakis, as a fiduciary to Vesta, in the rescission of the policies.

3                                                    **IX.**

4                                **INFORMATION ALLEGATIONS**

5          49.     Allegations made in this complaint have been based on information and belief,

6   except those allegations that pertain directly to Dillon, which are based on his personal

7   knowledge. Dillon's information and belief is based on, *inter alia*, the investigation conducted

8   by Dillon after his appointment on December 16, 2009 and his attorneys after their retention.

9   Each and every allegation and factual contention contained in this complaint has evidentiary

10  support or, alternatively, is likely to have evidentiary support after reasonable opportunity for

11  further investigation or discovery by Dillon or his counsel**.** Vesta was incapacitated until

12  Dillon's appointment on December 16, 2009, making it impossible for Vesta to discover the

13  bad acts of M&H until a fiduciary existed to represent its interests.

14         50.     M&H rescinded the $4 million in coverage on June 1, 2009.

15         51.      Dillon was appointed Receiver on December 16, 2009.  On December 13, 2010

16  M&H and Dillon entered into a tolling agreement which ran from December 13, 2010 to April

17  26, 2014, making this complaint timely pursuant to C.C.P. §340.6.

18                                                    **X.**

19                **NOTICE OF RELATED CASES TO SHOW THAT**

20                **INSURANCE CODE § 533 WAS NOT IMPLICATED.**

21         52.     Dillon was appointed Receiver of Vesta in *United States Insurance Company v.*

22  *Samuel W. Henka, et al.,* Case No. 09-02388 JW PVT (hereinafter, the "U.S. Fire Case").  In

23  the U.S. Fire Case, Dillon filed a counter-claim against U.S. Fire for declaratory judgment,

24  breach of contracts and to set aside of fraudulent conveyances.  Dillon accepted $750,000

25  from U.S. Fire on the $4,000,000 in coverage, and Dillon paid this money (less fees and costs)

26  to the exchangers with unpaid exchanges.  None of the money went to Terzakis or Estupinian.

27  U.S. Fire had the right to seek subrogation from Terzakis and Estupinian for the amounts paid

28  to Vesta under the two policies. Therefore, Insurance Code § 533 was not implicated.

53.     U.S. Fire was also a defendant in the matter styled as *SCCAA Holdings, LLC v. Brown & Brown of California, et al*., United States District Court for the District of Nevada Case No. 2:07-CV-00536-RCJ-LRL.  In that case, U.S. Fire paid $4,000,000 to settle coverage claims arising out of the theft of exchange funds by the owner of Southwest Exchange, Donald McGhan ("McGhan").  The U.S. Fire policy issued to Southwest Exchange contained the same language as the U.S. Fire Policies issued to Vesta.  The money paid by U.S. Fire was distributed by the Receiver for Southwest Exchange directly to the exchangers with unfunded exchanges.  None of the U.S. Fire money went to McGhan. Therefore, Insurance Code § 533 was not implicated.

54.     Terzakis and Estupinian were defendants in the criminal matter of *United States v. John Terzakis*, Case No. CR-09-1212-JF-2 (the "Criminal Case").  Restitution Judgments have been entered against Terzakis and Estupinian in favor of the United States Government for the benefit of the exchangers.

## XI.

## CAUSES OF ACTION

## <u>FIRST CAUSE OF ACTION</u>

### Legal Malpractice

55.     Dillon incorporates all prior paragraphs and incorporates them by reference as though fully set forth again.

56.     M&H were the attorneys for Vesta. Vesta suffered a loss under the U.S. Fire Policies for owner theft of client exchange funds.  The U.S. Fire Policies would have paid for the loss caused to Vesta.  M&H rescinded the U.S. Fire Policies, trading $4 million in coverage for $40,000, so they could get paid attorneys fees.

57.     Rescission of the U.S. Fire Policies was not good for Vesta.  M&H knew that Terzakis was acting adverse to Vesta so Terzakis could not grant authority to rescind the policies on behalf of Vesta.

58.     Vesta suffered $3,290,000 in damages as the result of the imprudence of M&H and the breach of loyalty M&H owed to Vesta.  M&H had a conflict of interest in representing

1   Vesta but following the instruction of Terzakis who was acting adverse to Vesta.

2      59.    Vesta has been injured by the negligence of M&H; the exact amount will be

3   shown at trial but it is no less than $3,290,000.

4                          **SECOND CAUSE OF ACTION**

5                   **Aiding and Abetting Breach of Fiduciary Duty**

6      60.    Dillon incorporates all prior paragraphs and incorporates them by reference as

7   though fully set forth again.

8      61.    Terzakis owed Vesta a fiduciary duty.  M&H knew Terzakis owed Vesta a

9   fiduciary duty.  Terzakis breached his fiduciary duty owed to Vesta by rescinding the U.S. Fire

10  Policies.  M&H knowingly assisted Terzakis in breaching his fiduciary duties owed to Vesta by

11  rescinding the U.S. Fire Policies so they could get paid.

12     62.    M&H's assistance to Terzakis caused damage to Vesta in that Vesta's U.S. Fire

13  Policies were rescinded.  The exact amount of Vesta's loss will be shown at trial, but it is no

14  less than $3,290,000.

15                          **THIRD CAUSE OF ACTION**

16                          **Fraudulent Conveyance**

17     63.    Dillon incorporates all prior paragraphs and incorporates them by reference as

18  though fully set forth again.

19     64.     Terzakis, the debtor, owed Vesta approximately $20 million in stolen exchange

20  funds.  M&H and Vesta were both creditors of Terzakis.

21     65.    M&H took $40,000 of Vesta's premiums worth $4 million in coverage for Vesta

22  to satisfy debts owed by Terzakis. M&H defrauded Vesta as a creditor of Terzakis.  M&H was

23  not a good faith transferee, entitling Vesta to recover judgment against M&H for the value of the

24  asset transferred to U.S. Fire, subject to adjustments as the equities may require.

25                                **XII.**

26                          **PRAYER FOR RELIEF**

27     WHEREFORE, Dillon prays for Judgment against M&H as follows:

28         1.      For damages, as applicable;

**VESTA'S COMPLAINT AGAINST MURPHY & HOURIHANE, LLC**

2.      For pre-judgment interest;

3.      For costs of this action, including reasonable attorneys' fees as afforded by any applicable law;

4.      For all other relief the Court deems just and proper.

## XIII.

## JURY DEMAND

The Receiver demands a trial by Jury for all issues which may be so resolved.

DATED: April 23, 2014

HOLLISTER & BRACE

By _____

Robert L. Brace, Esq., SBN. 122240

*Attorneys for Thomas Dillon, as Court-Appointed Receiver for Vesta Strategies, LLC*

VESTA'S COMPLAINT AGAINST MURPHY & HOURIHANE, LLC

# EXHIBIT 1

United States District Court

For the Northern District of California

1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT
8               FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                            SAN JOSE DIVISION
10   United States Fire Insurance Company,          NO. C 09-02388 JW
11                    Plaintiff,                     **ORDER GRANTING MOTION TO
                                                     APPOINT RECEIVER; ORDER**
          v.                                         **APPOINTING RECEIVER**
12   Vesta Strategies, LLC, et al.,
13                    Defendants.
14   _____/
15          Presently before the Court is Counter-Claimants and Cross-Claimants Samuel W. Henka,
16   Michael Simmons, Joyce Simmons, Christopher Walsh, and Maria Del Carmen Alonso's
17   (collectively, "Cross-Claimants") Motion to Appoint Receiver for Defendant Vesta Strategies, LLC
18   and Cross-Defendant Excalibur 1031 Group, LLC. (hereafter, "Motion," Docket Item No. 75.)
19   Plaintiff does not oppose the Motion. (See Response of U.S. Fire Insurance Company to Motion for
20   Appointment of Receiver at 2, hereafter, "Response," Docket Item No. 93.) The Court finds it
21   appropriate to take the matter under submission without oral argument. See Civ. L.R. 7-1(b).
22   Cross-Claimants seek appointment, on behalf of themselves and the putative class, of a receiver to
23   represent and act on behalf of Vesta Strategies, LLC and Excalibur 1031 Group, LLC (collectively,
24   "Exchange Entities"). (Motion at 4.)
25          Cross-Claimants move for appointment of a receiver on the following basis:
26               As it stands, the Exchange Entities have been abandoned by their owners, and are
             currently incapacitated and without representation. The only known asset of any value held
27           by the Exchange Entities and available to satisfy creditors' claims are the Commercial Crime
             [Insurance] Policies with 1031 Tax-Deferred Exchange Endorsements purchased by the
28           Exchange Entities ('Crime Policies'). The Crime Policies protect against owner theft of

**EXHIBIT 1**

client funds in qualified intermediaries such as the Exchange Funds. The Crime Policies are in imminent danger of being harmed or forever lost as a result of the incapacitation of the Exchange Entities. A receiver is needed to take control of the Exchange Entities and represent their interests, as well as to manage, preserve, and protect the assets of the Exchange Entities, including the Crime Policies.

The Crime Policies, by their terms, require the named insureds to submit notice and proof of loss due to owner theft as a prerequisite to obtaining any benefits under the Policies. The named insureds under the Crime Policies are the Exchange Funds, not Cross-Claimants. The owners of the Exchange Funds (Cross-Defendants John Terzakis and Robert Estupinian), who are accused of looting the Exchange Funds, have failed and refused to make a claim under the Policies. Furthermore, each of the Crime Policies require that claims made against the Policies be timely. Thus, unless a receiver is appointed to act in the name of the Exchange Entities to preserve and protect the insurance, the Crime Policies face the immediate danger of loss by default.

(Motion at 4-5, 7, 9-10, 14.)

Upon review of the parties' submissions, the Court finds that appointment of a receiver is warranted in this case to protect the interest of Cross-Claimants and the putative class as creditors against the potential loss of assets held by the Exchange Funds. See Civ. L.R. 66; Fed. R. Civ. P. 66; S.E.C. v. Hardy, 803 F.2d 1034, 1038-39 (9th Cir. 1986).

Accordingly, the Court GRANTS Cross-Claimants' Motion and appoints Thomas A. Dillon as Receiver to represent and act on behalf of Vesta Strategies, LLC and Excalibur 1031 Group, LLC.[1] This appointment is effective upon the filing of (1) the Oath of Receiver and (2) Receiver's Bond in the penal sum of $2,500.

During the period of receivership, IT IS ORDERED THAT THE RECEIVER SHALL BE AUTHORIZED AS FOLLOWS:

(1) The Receiver shall assume possession and control of all property and assets held in the name of the Exchange Entities, including, without limitation, any and all insurance policies and related assets purchased by or owned by the Exchange Entities (the "Property").

---

[1] Cross-Claimants represent that Mr. Dillon is a practicing attorney who has served numerous appointments as an independent fiduciary and receiver under the supervision and direction of federal district courts, and is willing to act as a receiver in this case at an hourly rate of $300. (See Declaration of Peter L. Candy in Support of Motion to Appoint Receiver ¶¶17-18, Ex. 1, Docket Item No. 76.)

2

EXHIBIT 1

United States District Court

For the Northern District of California

(2)  The Receiver shall manage, preserve, and maintain the Property, on behalf of the receivership estate (the "Estate"), and any creditors of the Estate, pending further order of the Court.  This includes filing notices of claims and submitting proofs of loss as necessary to protect and preserve insurance claims on behalf of the creditors of the Estate.

(3)  The Receiver shall take possession of all the books and records pertaining to the Property of the Exchange Entities, wherever located, as the Receiver deems necessary for the proper administration, management or control of the Property of the Estate.

(4)  The Receiver shall execute and prepare all documents and perform all acts, either in the name of the Exchange Entities or in the Receiver's own name, which are necessary or incidental to preserving, protecting, managing or controlling the Property of the Estate.

(5)  The Receiver shall employ agents, servants, employees, accountants, and management consultants, and others as reasonably necessary to preserve, protect, manage or control the Property of the Estate.

(6)  In the event monies come into possession of the Receiver pursuant to his administration, management or control of the Estate, the same shall be held by the Receiver as a common fund for the payment of the Exchange Entities' obligation to creditors suing the Exchange Entities on claims raised in the Counter-Complaint and Cross-Complaint filed in this action, subject to such orders as the Court may issue as to their disposition.

(7)  The Receiver shall establish bank accounts for the deposit of monies and funds collected and received in connection with his administration of the Estate, at any financial institution the Receiver deems appropriate, provided that any funds on deposit at the financial institution are fully insured by an agency of the United States government.

3

**EXHIBIT 1**

(8)    The Receiver shall institute ancillary proceedings as are necessary to preserve and protect the Estate, and the Receiver may engage the services of legal counsel, if necessary, upon further application to the Court.

(9)    The Receiver shall, to the extent feasible, within ninety (90) days of his qualification hereunder, file in this action an inventory of all Property of which he shall have taken possession pursuant to this Order and shall conduct periodic accountings thereafter.

(10)   The Receiver shall prepare periodic interim statements reflecting the Receiver's fees and administrative costs and expenses incurred for that interim period in the operation and administration of the Estate.  Upon completion of an interim statement, and the mailing of the statement to the parties' respective attorneys of record, or any other designated person or agent, the Receiver shall submit the interim statements to the Court for its approval and confirmation.

(11)   The Receiver's fees and administrative costs and expenses approved by the Court shall be taxed as a cost against monies coming into possession of the Receiver pursuant to his administration, management or control of the Estate, and held as a common fund for the benefit of the creditors suing the Exchange Entities on claims raised in the Counter-Complaint and Cross-Complaint filed in this action.

(12)   The Receiver, or any party to this action, may, from time to time and on due notice to all parties, apply to the Court for further orders instructing the Receiver.

IT IS FURTHER ORDERED that the Exchange Entities, and all persons and entities now in possession of any part of the Property, shall immediately surrender their possession thereof to the Receiver.

Dated:  December 16, 2009

_____
JAMES WARE
United States District Judge

4

**EXHIBIT 1**

**United States District Court**
For the Northern District of California

1   **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2   Andrew B. Downs andy.downs@bullivant.com
    Becki F. Kieffer courtir@troutmansanders.com
3   Charles Edward Wheeler cwheeler@cozen.com
    Kevin Richard Martin kevin@pattonmartinsullivan.com
4   Peter Roldan peter.roldan@bullivant.com
    Peter Laurence Candy plcandy@hbsb.com
5   Robert Louis Brace rlbrace@hbsb.com
    Shawn Robert Parr shawn@parrlawgroup.com

6

7
    **Dated:  December 16, 2009**                 **Richard W. Wieking, Clerk**
8

9                                                 By:____/s/ JW Chambers_____
                                                      **Elizabeth Garcia**
10                                                    **Courtroom Deputy**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

# EXHIBIT 2



**Crum&Forster**
A FAIRFAX Company
305 Madison Avenue, Morristown, NJ 07962

# COMMERCIAL CRIME POLICY

## 2005 - 2006

### POLICY # 626-030096-4 ISSUED TO:

### VESTA STRATEGIES LLC

## Crime & Financial Institutions

Crum & Forster
305 Madison Avenue
PO Box 1973
Morristown, NJ 07960-1973

(973)490-6830

**EXHIBIT 2**                        Exhibit A - Page 01



**Crum&Forster**
A FAIRFAX Company
305 Madison Avenue, Morristown, NJ 07962

POLICY NUMBER: 626-030096-4

# COMMERCIAL CRIME POLICY
# DECLARATIONS

In Return For The Payment Of The Premium, And Subject To All The Terms And Conditions Of This Policy, We Agree With You To Provide The Insurance As Stated In This Policy.

UNITED STATES FIRE INSURANCE COMPANY
A DELAWARE CORPORATION
HOME OFFICE: WILMINGTON, DELAWARE
(A Capital Stock Company)

CRC Insurance Services, Inc.
105 West Adams St. 18th Floor
Chicago, IL 60603
79042

NAMED INSURED:  Vesta Strategies LLC
(Also list any Employee Benefit Plan(s) Included as Insureds)

MAILING ADDRESS:  150 Almaden Blvd Suite 1375, San Jose, CA 95113

POLICY PERIOD:  August 19, 2005            to   August 19, 2006
(12:01 A.M. at your Mailing Address shown above)

INSURING AGREEMENTS, LIMITS OF INSURANCE AND DEDUCTIBLE

| INSURING AGREEMENTS | LIMIT OF INSURANCE Per Occurrence | DEDUCTIBLE AMOUNT Per Occurrence |
|---|---|---|
| 1. Employee Theft | $2,000,000.00 | $25,000.00 |
| 2. Forgery Or Alteration | Not Covered | |
| 3. Inside The Premises – Theft Of Money And Securities | Not Covered | |
| 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property | Not Covered | |
| 5. Outside The Premises | Not Covered | |
| 6. Computer Fraud | Not Covered | |
| 7. Funds Transfer Fraud | Not Covered | |
| 8. Money Orders And Counterfeit Paper Currency | Not Covered | |

If Added by Endorsement, Insuring Agreement(s):
Not Applicable
Not Applicable

If "Not Covered" is inserted above opposite any specified Insuring Agreement, such Insuring Agreement and any other reference thereto in this policy is deleted.

ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED: Endorsements 1, 2 and 3

PREMIUM: $20,000.00

CANCELLATION OF PRIOR INSURANCE ISSUED BY US:
By acceptance of this Policy you give us notice canceling prior policy Nos. _____ ;
the cancellation to be effective at the time this Policy becomes effective.

COUNTERSIGNED   September 12, 2005            BY:   _____
                        (Date)                    (Authorized Representative)

# COMMERCIAL CRIME POLICY
# (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations:

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

### 2. Forgery Or Alteration

a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

(1) Made or drawn by or drawn upon you; or

(2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

b. If you are sued for refusing to pay any instrument covered in Paragraph a. above, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises – Theft Of Money And Securities

a. We will pay for loss of "money" and "securities" inside the "premises" or "banking premises" resulting directly from "theft", disappearance or destruction.

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

a. We will pay for loss of or damage to "other property":

(1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

(2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

### 5. Outside The Premises

a. We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

© ISO Properties, Inc., 2001

**EXHIBIT 2**

### 6. Computer Fraud

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

**a.** To a person (other than a "messenger") outside those "premises"; or

**b.** To a place outside those "premises".

### 7. Funds Transfer Fraud

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

### 8. Money Orders And Counterfeit Paper Currency

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**a.** Money orders issued by any post office, express company or bank that are not paid upon presentation; or

**b.** "Counterfeit" paper currency that is acquired during the regular course of business.

## B. Limit Of Insurance

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

## C. Deductible

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount may be applied.

## D. Exclusions

**1.** This policy does not apply to:

**a. Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

**(1)** You; or

**(2)** Any of your partners or "members";

whether acting alone or in collusion with other persons.

**b. Acts Of Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(1)** Whether acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement A.1.

**c. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**d. Indirect Loss**

Loss that is an indirect result of any act or "occurrence" covered by this policy including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

**e. Legal Expenses**

Expenses related to any legal action, except when covered under Insuring Agreement A.2.

**f. Nuclear**

Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

**g. War And Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

**2.** Insuring Agreement A.1. does not apply to:

**a. Employee Cancelled Under Prior Insurance**

Loss caused by any "employee" of yours, or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

© ISO Properties, Inc., 2001

**EXHIBIT 2**

### b. Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

### c. Trading

Loss resulting directly or indirectly from trading, whether in your name or in a genuine or fictitious account.

### d. Warehouse Receipts

Loss resulting from fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements A.3., A.4. and A.5. do not apply to:

### a. Accounting Or Arithmetical Errors Or Omissions

Loss resulting from accounting or arithmetical errors or omissions.

### b. Exchanges Or Purchases

Loss resulting from the giving or surrendering of property in any exchange or purchase.

### c. Fire

Loss resulting from fire, however caused, except:

(1) Loss of or damage to "money" and "securities"; and

(2) Loss from damage to a safe or vault.

### d. Money Operated Devices

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

### e. Motor Vehicles Or Equipment And Accessories

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

### f. Transfer Or Surrender Of Property

(1) Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

(a) On the basis of unauthorized instructions;

(b) As a result of a threat to do bodily harm to any person; or

(c) As a result of a threat to do damage to any property.

(2) But, this Exclusion does not apply under Insuring Agreement A.5. to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

(a) Had no knowledge of any threat at the time the conveyance began; or

(b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

### g. Vandalism

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

### h. Voluntary Parting Of Title To Or Possession Of Property

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement A.6. does not apply to:

### a. Exchanges Or Purchases

Loss resulting from the giving or surrendering of property in any exchange or purchase.

### b. Funds Transfer Fraud

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

### c. Inventory Shortages

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

**EXHIBIT 2**

Exhibit A - Page 05

**d. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

5. Insuring Agreement **A.7.** does not apply to:

**Computer Fraud**

Loss resulting from the use of any computer to fraudulently cause a transfer of "money", "securities" or "other property".

## E. Conditions

**1. Conditions Applicable To All Insuring Agreements**

**a. Cancellation As To Any Employee**

This policy is cancelled as to any "employee":

(1) Immediately upon discovery by:

(a) You; or

(b) Any of your partners, "members" "managers", officers, directors or trustees not in collusion with the "employee";

of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Cancellation Of Policy**

(1) The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

(2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(a) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

**c. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**d. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

(1) This policy;

(2) The property covered under this policy;

(3) Your interest in the property covered under this policy; or

(4) A claim under this policy.

**e. Consolidation — Merger**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become "employees" or you acquire the use and control of any additional "premises":

(1) You must give us written notice and obtain our written consent to extend this insurance to such additional "employees" or "premises". We may condition our consent upon payment of an additional premium; but

© ISO Properties, Inc., 2001

CR 00 22 07 02

**EXHIBIT 2**

Exhibit A - Page 06

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, any insurance afforded for "employees" or "premises" also applies to these additional "employees" or "premises" for acts committed or events occurring within this 90 day period.

f. **Discovery**

(1) We will pay for loss that you sustain through acts committed or events occurring at any time and discovered by you:

(a) During the policy period shown in the Declarations; or

(b) During the period of time provided in the Extended Period To Discover Loss Condition E.1.j.

(2) Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when you receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this policy.

g. **Duties In The Event Of Loss**

After you discover a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreements A.1. or A.2.) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Give us a detailed, sworn proof of loss within 120 days.

(4) Cooperate with us in the investigation and settlement of any claim.

h. **Employee Benefit Plan(s)**

(1) The "employee benefit plan(s)" shown in the Declarations are included as Insureds under Insuring Agreement A.1.

(2) If any "employee benefit plan(s)" is insured jointly with any other entity under this policy, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement A.1. that is sufficient to provide a limit of Insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(3) With respect to losses sustained or discovered by any such Plan, Insuring Agreement A.1. is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(4) If the first Named Insured is an entity other than a Plan, any payment we make to that Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.

(5) If two or more Plans are insured under this policy, any payment we make for loss:

(a) Sustained by two or more Plans; or

(b) Of commingled "funds" or "other property" of two or more Plans;

that arises out of one "occurrence", is to be shared by each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total of those limits.

(6) The Deductible Amount applicable to Insuring Agreement A.1. does not apply to loss sustained by any "employee benefit plan(s)".

i. **Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to 3 years afterward.

j. **Extended Period To Discover Loss**

(1) We will pay for loss that you sustained prior to the effective date of termination or cancellation of this policy, which is discovered by you:

(a) No later than 60 days from the date of that termination or cancellation; and

**EXHIBIT 2**

(b) As respects any "employee benefit plan(s)", no later than 1 year from the date of that termination or cancellation.

(2) However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance coverage provides coverage for loss sustained prior to its effective date.

k. **Inspections And Surveys**

(1) We have the right to:

(a) Make inspections and surveys at any time;

(b) Give you reports on the conditions we find; and

(c) Recommend changes.

(2) We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(a) Are safe or healthful; or

(b) Comply with laws, regulations, codes or standards.

(3) Paragraphs (1) and (2) above apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

l. **Joint Insured**

(1) If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this policy. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

(2) If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this policy, that knowledge is considered knowledge of every Insured.

(3) An "employee" of any Insured is considered to be an "employee" of every Insured.

(4) If this policy or any of its coverages is cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered by you during the period of time provided in the Extended Period To Discover Loss Condition E.1.j.

However, this extended period to discover loss terminates as to that Insured immediately upon the effective date of any other insurance obtained by that Insured replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(5) We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

m. **Legal Action Against Us**

You may not bring any legal action against us involving loss:

(1) Unless you have complied with all the terms of this policy;

(2) Until 90 days after you have filed proof of loss with us; and

(3) Unless brought within 2 years from the date you discover the loss.

If any limitation is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

n. **Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

o. **Loss Covered Under More Than One Coverage Of This Policy**

If two or more coverages of this policy apply to the same loss, we will pay the lesser of:

(1) The actual amount of loss; or

(2) The sum of the Limits of Insurance applicable to those coverages.

© ISO Properties, Inc., 2001

CR 00 22 07 02

**EXHIBIT 2**

p. **Non-Cumulation Of Limit Of Insurance**

Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or policy period to policy period.

q. **Other Insurance**

This policy does not apply to loss recoverable or recovered under other insurance or indemnity. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity.

However, this policy will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the Declarations.

r. **Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease;

(2) That you hold for others; or

(3) For which you are legally liable, except for property inside the premises of a "client" of yours.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

s. **Premiums**

The first Named Insured shown in the Declarations:

(1) Is responsible for the payment of all premiums; and

(2) Will be the payee for any return premiums we pay.

t. **Records**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

u. **Recoveries**

(1) Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this policy will be distributed as follows:

(a) To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;

(b) Then to us, until we are reimbursed for the settlement made; and

(c) Then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

v. **Territory**

This policy covers acts committed or events occurring within the United States of America (including its territories and possessions), Puerto Rico and Canada.

w. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

x. **Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

y. **Valuation – Settlement**

(1) Subject to Section B. Limit Of Insurance, we will pay for:

(a) Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

(I) At face value in the "money" issued by that country; or

---

**EXHIBIT 2**

(ii) In the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(b) Loss of "securities" but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

(i) Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

i. Value of the "securities" at the close of business on the day the loss was discovered; or

ii. Limit of Insurance.

(c) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

(i) The Limit of Insurance applicable to the lost or damaged property;

(ii) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(2) We may, at our option, pay for loss of or damage to property other than "money":

(a) In the "money" of the country in which the loss occurred; or

(b) In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(3) Any property that we pay for or replace becomes our property.

2. **Condition Applicable To Insuring Agreement A.1.**

**Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition E.1.v. for a period of not more than 90 days.

3. **Conditions Applicable To Insuring Agreement A.2.**

a. **Deductible**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement A.2.

b. **Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

c. **Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. **Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition E.1.v. does not apply to Insuring Agreement A.2.

4. **Conditions Applicable To Insuring Agreements A.4. And A.5.**

a. **Armored Motor Vehicle Companies**

Under Insuring Agreement A.5., we will only pay for the amount of loss you cannot recover:

(1) Under your contract with the armored motor vehicle company; and

© ISO Properties, Inc., 2001

**EXHIBIT 2**

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

b. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

5. **Conditions Applicable To Insuring Agreement A.6.**

a. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

b. **Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition **E.1.v.** does not apply to Insuring Agreement **A.6.**

F. **Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Client" means any entity for whom you perform services under a written agreement.

3. "Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Employee":

a. "Employee" means:

(1) Any natural person:

(a) While in your service or for 30 days after termination of service;

(b) Who you compensate directly by salary, wages or commissions; and

(c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee" as defined in Paragraph (1) above, who is on leave; or

(b) To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph (2) above;

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan(s)" insured under this policy; and

(b) Your director or trustee while that person is handling "funds" or "other property" of any "employee benefit plan(s)" insured under this policy;

(5) Any natural person who is a former "employee", director, partner, "member", "manager", representative or trustee retained as a consultant while performing services for you; or

(6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises".

b. "Employee" does not mean:

(1) Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

© ISO Properties, Inc., 2001

**EXHIBIT 2**

(2) Any "manager", director or trustee except while performing acts coming within the scope of the usual duties of an "employee".

6. "Employee benefit plan(s)" means any welfare or pension benefit plan shown in the Declarations that is subject to the Employee Retirement Income Security Act of 1974 (ERISA).

7. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8. "Fraudulent instruction" means:

a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction (other than those described in Insuring Agreement A.2.) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently instructed by someone else without your or the "employee's" knowledge or consent.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means:

a. Currency, coins and bank notes in current use and having a face value; and

b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

a. As respects Insuring Agreement A.1., all loss caused by, or involving, one or more "employees", whether the result of a single act or series of acts.

b. As respects Insuring Agreement A.2., all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

c. As respects all other Insuring Agreements:

(1) An act or series of related acts involving one or more persons; or

(2) An act or event, or a series of related acts or events not involving any person.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property excluded under this policy.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

a. Caused or threatened to cause that person bodily harm; or

b. Committed an obviously unlawful act witnessed by that person.

18. "Safe burglary" means the unlawful taking of:

a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

b. A safe or vault from inside the "premises".

19. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

20. "Theft" means the unlawful taking of "money", "securities" or "other property" to the deprivation of the insured.

© ISO Properties, Inc., 2001

CR 00 22 07 02

**EXHIBIT 2**

21. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

a. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

b. By means of written instructions (other than those described in Insuring Agreement A.2.) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

22. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

**Endorsement # 1** Effective **August 19, 2005** Attached to and forming a part of Policy # **626-030096-4**
Issued to **Vesta Strategies LLC** *et. al.*

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

Paragraphs **A.** and **B.** below apply only to the Commercial Crime Policy and Government Crime Policy.

**A.** Paragraphs **(2)** and **(3)** of the **Cancellation Of Policy** Condition are replaced by the following:

**(2) All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

(a) 10 days before the effective date of cancellation if we cancel for:

(i) Nonpayment of premium; or

(ii) Discovery of fraud by:

I. Any insured or his or her representative in obtaining this policy; or

II. You or your representative in pursuing a claim under this policy.

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

**(3) All Policies In Effect For More Than 60 Days**

(a) If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

(i) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

(ii) Discovery of fraud or material misrepresentation by:

I. Any insured or his or her representative in obtaining this policy; or

II. You or your representative in pursuing a claim under this policy.

(iii) A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

(iv) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

(v) Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

(vi) A determination by the Commissioner of Insurance that the:

I. Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

II. Continuation of the policy coverage would:

(I) Place us in violation of California law or the laws of the state where we are domiciled; or

(II) Threaten our solvency.

CR 02 49 11 04                    © ISO Properties, Inc., 2004                    Page 1 of 2    ☐

**EXHIBIT 2**                                    Exhibit A—Page 14

**(vii)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**(b)** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(i)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(ii)** 30 days before the effective date of cancellation If we cancel for any other reason listed in Paragraph (3)(a).

**B.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

**1.** Subject to the provisions of Paragraph **B.2.** below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **B.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the time frames shown in Paragraph **B.1.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

**C.** Under the Commercial Crime Policy, Government Crime Policy and Employee Theft And Forgery Policy, the following is added to the **Valuation — Settlement** Condition:

Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

                    © ISO Properties, Inc., 2004                    CR 02 49 11 04        □

**EXHIBIT 2**

Endorsement # 2 Effective August 19, 2005 Attached to and forming a part of Policy # 626-030096-4
Issued to Vesta Strategies LLC *et. al.*

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TAX-DEFERRED EXCHANGE ENDORSEMENT

It is agreed that:

1. CONDITION **E.1.r.** is deleted in its entirety and replaced by the following:

   **Ownership of Property; Interests Covered:**

   The property covered under this insurance is limited to property:

   a.  That you own or hold; or

   b.  For which you are legally liable; or

   c.  Held in a financial institution account in a transaction involving you as a qualified in-termediary for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031.

   However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

2. EXCLUSION **D.1.a.** does not apply to losses involving the "funds" of a "client" while you are acting as a qualified intermediary in a tax-deferred exchange of property for such "client" intended to qualify under Internal Revenue Code 1031.

3. Any loss paid (as well as any fees, costs or expenses incurred by us) as a result of the waiver of Exclusion **D.1.a.** pursuant to paragraph 2, above, will be subject to all rights of recovery that we may have against you and your partners or "members". You and they, collectively and severally, agree to indemnify us immediately for all such loss, fees, costs and expenses. The foregoing is in addition to any other rights we have under the law or under this policy.

4. Any payment of loss under this policy involving a transaction intended to qualify as a tax-deferred exchange of property under Internal Revenue Code 1031 is conditioned upon your having complied with the following conditions precedent to coverage:

   a.  A written contractual agreement will be maintained between you as intermediary and each "client" stipulating the manner in which proceeds from the relinquished property will be held and subsequently released by you as intermediary for use in acquiring re-placement property.

   b.  Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from your operating "funds", and each single exchange transaction shall be identified by a specific file number or similar

**EXHIBIT 2**

Exhibit A - Page 16

tracking identification so as to provide a clear paper trail for each exchange transaction or series of related exchange transactions.

c. Countersignature will be required for the release of all "funds" or a monthly reconciliation of all accounts involving exchange transaction proceeds will be performed within two weeks of receipt of the account statement. Those reconciliations must be performed by an individual not authorized to deposit, withdraw or transfer funds from the account or be reviewed by an outside CPA.

**EXHIBIT 2**                    Exhibit A - Page 17

**Endorsement # 3** Effective **August 19, 2005** Attached to and forming a part of Policy # 626-030096-4
Issued to **Vesta Strategies LLC** et. al.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# INCLUDE RETROACTIVE DATE FOR NAMED INSURED

This endorsement modifies insurance provided under the Discovery Form version of the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**A. Schedule\***

| |
|---|
| Retroactive Date:  August 15, 2005 |
| \* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

**B. Provisions**

Paragraph (1) of the **Discovery** Condition is replaced by the following:

We will only pay for loss that you sustain through acts committed or events occurring after the Retroactive Date shown in the Schedule and discovered by you:

1. During the policy period shown in the Declarations; or

2. During the period of time provided in the Extended Period To Discover Loss Condition.

Copyright, Insurance Services Office, Inc., 1998

**EXHIBIT 2**

**United States Fire Insurance Company**
**A Delaware Corporation**
**Home Office: Wilmington, DE**

(A Capital Stock Company)

SIGNATURE

Nikolas Antonopoulos
President

SIGNATURE

Valerie J. Gasparik
Secretary

**EXHIBIT 2**



*A FAIRFAX Company*

*CRIME INSURANCE FOR THE 21ST CENTURY*

# COMMERCIAL CRIME POLICY

## 2006 - 2007

### POLICY # 626-030403-3 ISSUED TO:

### VESTA STRATEGIES, LLC

#### Crime & Financial Institutions

**Crum & Forster**
**305 Madison Avenue**
**PO Box 1973**
**Morristown, NJ 07960-1973**

(973) 490-6830

**EXHIBIT 2**

CONFIDENTIAL

**POLICY NUMBER: 626-030403-3**



**Crum&Forster**
A FAIRFAX Company
305 Madison Avenue, Morristown, NJ 07962

# COMMERCIAL CRIME POLICY
# DECLARATIONS

In Return For The Payment Of The Premium, And Subject To All The Terms And Conditions Of This Policy, We Agree With You To Provide The Insurance As Stated In This Policy.

UNITED STATES FIRE INSURANCE COMPANY
A DELAWARE CORPORATION
HOME OFFICE: WILMINGTON, DELAWARE
(A Capital Stock Company)

CRC Insurance Services, Inc.
105 West Adams, 19th Floor
Chicago, Illinois 60603
79042

**NAMED INSURED:** Vesta Strategies, LLC
(Also list any Employee Benefit Plan(s) included as Insureds)
**MAILING ADDRESS:** 150 Almaden Boulevard, Suite 1375, San Jose, California 95113
**POLICY PERIOD:** July 19, 2006      to July 19, 2007
(12:01 A.M. at your Mailing Address shown above)

INSURING AGREEMENTS, LIMITS OF INSURANCE AND DEDUCTIBLE

| INSURING AGREEMENTS | LIMIT OF INSURANCE Per Occurrence | DEDUCTIBLE AMOUNT Per Occurrence |
|---|---|---|
| 1. Employee Theft | $2,000,000.00 | $25,000.00 |
| 2. Forgery Or Alteration | Not Covered | — |
| 3. Inside The Premises – Theft Of Money And Securities | Not Covered | — |
| 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property | Not Covered | — |
| 5. Outside The Premises | Not Covered | — |
| 6. Computer Fraud | Not Covered | — |
| 7. Funds Transfer Fraud | Not Covered | — |
| 8. Money Orders And Counterfeit Paper Currency | Not Covered | — |

If Added by Endorsement, Insuring Agreement(s):
Not Applicable
Not Applicable
If "Not Covered" is inserted above opposite any specified Insuring Agreement, such Insuring Agreement and any other reference thereto in this policy is deleted.

ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED: OFAC Notice; California Changes (CR 02 49 11 04); Include Retroactive Date For Named Insured (CR 20 05 03 00); and Tax-Deferred Exchange Endorsement

PREMIUM: $20,000.00

CANCELLATION OF PRIOR INSURANCE ISSUED BY US:
By acceptance of this Policy you give us notice canceling prior policy Nos. 626-030096-4      ;
the cancellation to be effective at the time this Policy becomes effective.

COUNTERSIGNED   July 19, 2006      BY: _____
         (Date)                  (Authorized Representative)

CR DS 02 07 02        © ISO Properties, Inc., 2001        Page 1 of 1

CONFIDENTIAL

**EXHIBIT 2**

USF000326

# COMMERCIAL CRIME POLICY
# (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations:

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

### 2. Forgery Or Alteration

**a.** We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

(1) Made or drawn by or drawn upon you; or

(2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

**b.** If you are sued for refusing to pay any instrument covered in Paragraph **a.** above, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises – Theft Of Money And Securities

**a.** We will pay for loss of "money" and "securities" inside the "premises" or "banking premises" resulting directly from "theft", disappearance or destruction.

**b.** We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

**c.** We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

**a.** We will pay for loss of or damage to "other property":

(1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

(2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

**b.** We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

**c.** We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

### 5. Outside The Premises

**a.** We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

**b.** We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

© ISO Properties, Inc., 2001

**EXHIBIT 2**

CONFIDENTIAL USF000327

6. **Computer Fraud**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

a. To a person (other than a "messenger") outside those "premises"; or

b. To a place outside those "premises".

7. **Funds Transfer Fraud**

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

8. **Money Orders And Counterfeit Paper Currency**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

a. Money orders issued by any post office, express company or bank that are not paid upon presentation; or

b. "Counterfeit" paper currency that is acquired during the regular course of business.

B. **Limit Of Insurance**

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

C. **Deductible**

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount may be applied.

D. **Exclusions**

1. This policy does not apply to:

a. **Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

(1) You; or

(2) Any of your partners or "members";

whether acting alone or in collusion with other persons.

b. **Acts Of Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(1) Whether acting alone or in collusion with other persons; or

(2) While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

c. **Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

d. **Indirect Loss**

Loss that is an indirect result of any act or "occurrence" covered by this policy including, but not limited to, loss resulting from:

(1) Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

(2) Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

(3) Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

e. **Legal Expenses**

Expenses related to any legal action, except when covered under Insuring Agreement **A.2.**

f. **Nuclear**

Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

g. **War And Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

2. Insuring Agreement **A.1.** does not apply to:

a. **Employee Cancelled Under Prior Insurance**

Loss caused by any "employee" of yours, or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

© ISO Properties, Inc., 2001        CR 00 22 07 02

**EXHIBIT 2**

CONFIDENTIAL                                                        USF000328

**b. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**c. Trading**

Loss resulting directly or indirectly from trading, whether in your name or in a genuine or fictitious account.

**d. Warehouse Receipts**

Loss resulting from fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

**3.** Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not apply to:

**a. Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c. Fire**

Loss resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

**d. Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**e. Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**f. Transfer Or Surrender Of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

**(a)** On the basis of unauthorized instructions;

**(b)** As a result of a threat to do bodily harm to any person; or

**(c)** As a result of a threat to do damage to any property.

**(2)** But, this Exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

**(a)** Had no knowledge of any threat at the time the conveyance began; or

**(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

**4.** Insuring Agreement **A.6.** does not apply to:

**a. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**b. Funds Transfer Fraud**

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**c. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

**EXHIBIT 2**

CONFIDENTIAL      USF000329

d. **Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

5. Insuring Agreement **A.7.** does not apply to:

**Computer Fraud**

Loss resulting from the use of any computer to fraudulently cause a transfer of "money", "securities" or "other property".

E. **Conditions**

1. **Conditions Applicable To All Insuring Agreements**

a. **Cancellation As To Any Employee**

This policy is cancelled as to any "employee":

(1) Immediately upon discovery by:

(a) You; or

(b) Any of your partners, "members" "managers", officers, directors or trustees not in collusion with the "employee";

of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

b. **Cancellation Of Policy**

(1) The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

(2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(a) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

(b) 30 days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

c. **Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

d. **Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

(1) This policy;

(2) The property covered under this policy;

(3) Your interest in the property covered under this policy; or

(4) A claim under this policy.

e. **Consolidation — Merger**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become "employees" or you acquire the use and control of any additional "premises":

(1) You must give us written notice and obtain our written consent to extend this insurance to such additional "employees" or "premises". We may condition our consent upon payment of an additional premium; but

© ISO Properties, Inc., 2001 CR 00 22 07 02

**EXHIBIT 2**

CONFIDENTIAL USF000330

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, any insurance afforded for "employees" or "premises" also applies to these additional "employees" or "premises" for acts committed or events occurring within this 90 day period.

f. **Discovery**

(1) We will pay for loss that you sustain through acts committed or events occurring at any time and discovered by you:

    (a) During the policy period shown in the Declarations; or

    (b) During the period of time provided in the Extended Period To Discover Loss Condition **E.1.j.**

(2) Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when you receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this policy.

g. **Duties In The Event Of Loss**

After you discover a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreements **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Give us a detailed, sworn proof of loss within 120 days.

(4) Cooperate with us in the investigation and settlement of any claim.

h. **Employee Benefit Plan(s)**

(1) The "employee benefit plan(s)" shown in the Declarations are included as Insureds under Insuring Agreement **A.1.**

(2) If any "employee benefit plan(s)" is insured jointly with any other entity under this policy, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a limit of insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(3) With respect to losses sustained or discovered by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(4) If the first Named Insured is an entity other than a Plan, any payment we make to that Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.

(5) If two or more Plans are insured under this policy, any payment we make for loss:

    (a) Sustained by two or more Plans; or

    (b) Of commingled "funds" or "other property" of two or more Plans;

that arises out of one "occurrence", is to be shared by each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total of those limits.

(6) The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any "employee benefit plan(s)".

i. **Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to 3 years afterward.

j. **Extended Period To Discover Loss**

(1) We will pay for loss that you sustained prior to the effective date of termination or cancellation of this policy, which is discovered by you:

    (a) No later than 60 days from the date of that termination or cancellation; and

**EXHIBIT 2**

CONFIDENTIAL

USF000331

(b) As respects any "employee benefit plan(s)", no later than 1 year from the date of that termination or cancellation.

(2) However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

k. **Inspections And Surveys**

(1) We have the right to:

(a) Make inspections and surveys at any time;

(b) Give you reports on the conditions we find; and

(c) Recommend changes.

(2) We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(a) Are safe or healthful; or

(b) Comply with laws, regulations, codes or standards.

(3) Paragraphs (1) and (2) above apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

l. **Joint Insured**

(1) If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this policy. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

(2) If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this policy, that knowledge is considered knowledge of every Insured.

(3) An "employee" of any Insured is considered to be an "employee" of every Insured.

(4) If this policy or any of its coverages is cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered by you during the period of time provided in the Extended Period To Discover Loss Condition E.1.j.

However, this extended period to discover loss terminates as to that Insured immediately upon the effective date of any other insurance obtained by that Insured replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(5) We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

m. **Legal Action Against Us**

You may not bring any legal action against us involving loss:

(1) Unless you have complied with all the terms of this policy;

(2) Until 90 days after you have filed proof of loss with us; and

(3) Unless brought within 2 years from the date you discover the loss.

If any limitation is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

n. **Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

o. **Loss Covered Under More Than One Coverage Of This Policy**

If two or more coverages of this policy apply to the same loss, we will pay the lesser of:

(1) The actual amount of loss; or

(2) The sum of the Limits of Insurance applicable to those coverages.

© ISO Properties, Inc., 2001

CR 00 22 07 02

**EXHIBIT 2**

CONFIDENTIAL

USF000332

**p. Non-Cumulation Of Limit Of Insurance**

Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or policy period to policy period.

**q. Other Insurance**

This policy does not apply to loss recoverable or recovered under other insurance or indemnity. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity.

However, this policy will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the Declarations.

**r. Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease;

(2) That you hold for others; or

(3) For which you are legally liable, except for property inside the premises of a "client" of yours.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

**s. Premiums**

The first Named Insured shown in the Declarations:

(1) Is responsible for the payment of all premiums; and

(2) Will be the payee for any return premiums we pay.

**t. Records**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

**u. Recoveries**

(1) Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this policy will be distributed as follows:

(a) To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;

(b) Then to us, until we are reimbursed for the settlement made; and

(c) Then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

**v. Territory**

This policy covers acts committed or events occurring within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**w. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**x. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**y. Valuation — Settlement**

(1) Subject to Section B. Limit Of Insurance, we will pay for:

(a) Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

(i) At face value in the "money" issued by that country; or

**EXHIBIT 2**

CONFIDENTIAL                                                                                      USF000333

   (ii) In the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(b) Loss of "securities" but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

   (i) Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

   (ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

      i. Value of the "securities" at the close of business on the day the loss was discovered; or

      ii. Limit of Insurance.

(c) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

   (i) The Limit of Insurance applicable to the lost or damaged property;

   (ii) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

   (iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

We will not pay on a replacement cost basis for any loss or damage:

   (i) Until the lost or damaged property is actually repaired or replaced; and

   (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(2) We may, at our option, pay for loss of or damage to property other than "money":

   (a) In the "money" of the country in which the loss occurred; or

   (b) In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(3) Any property that we pay for or replace becomes our property.

2. **Condition Applicable To Insuring Agreement A.1.**

**Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition **E.1.v.** for a period of not more than 90 days.

3. **Conditions Applicable To Insuring Agreement A.2.**

  a. **Deductible**

    The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

  b. **Electronic And Mechanical Signatures**

    We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

  c. **Proof Of Loss**

    You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

  d. **Territory**

    We will cover loss you sustain anywhere in the world. The Territory Condition **E.1.v.** does not apply to Insuring Agreement **A.2.**

4. **Conditions Applicable To Insuring Agreements A.4. And A.5.**

  a. **Armored Motor Vehicle Companies**

    Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

    (1) Under your contract with the armored motor vehicle company; and

© ISO Properties, Inc., 2001

CR 00 22 07 02

**EXHIBIT 2**

CONFIDENTIAL

USF000334

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

b. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

5. **Conditions Applicable To Insuring Agreement A.6.**

a. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

b. **Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition **E.1.v.** does not apply to Insuring Agreement A.6.

F. **Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Client" means any entity for whom you perform services under a written agreement.

3. "Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Employee":

a. "Employee" means:

(1) Any natural person:

(a) While in your service or for 30 days after termination of service;

(b) Who you compensate directly by salary, wages or commissions; and

(c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee" as defined in Paragraph **(1)** above, who is on leave; or

(b) To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan(s)" insured under this policy; and

(b) Your director or trustee while that person is handling "funds" or "other property" of any "employee benefit plan(s)" insured under this policy;

(5) Any natural person who is a former "employee", director, partner, "member", "manager", representative or trustee retained as a consultant while performing services for you; or

(6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises".

b. "Employee" does not mean:

(1) Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

**EXHIBIT 2**

CONFIDENTIAL

USF000335

(2) Any "manager", director or trustee except while performing acts coming within the scope of the usual duties of an "employee".

6. "Employee benefit plan(s)" means any welfare or pension benefit plan shown in the Declarations that is subject to the Employee Retirement Income Security Act of 1974 (ERISA).

7. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8. "Fraudulent instruction" means:

a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction (other than those described in Insuring Agreement **A.2.**) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means:

a. Currency, coins and bank notes in current use and having a face value; and

b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

a. As respects Insuring Agreement **A.1.**, all loss caused by, or involving, one or more "employees", whether the result of a single act or series of acts.

b. As respects Insuring Agreement **A.2.**, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

c. As respects all other Insuring Agreements:

(1) An act or series of related acts involving one or more persons; or

(2) An act or event, or a series of related acts or events not involving any person.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property excluded under this policy.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

a. Caused or threatened to cause that person bodily harm; or

b. Committed an obviously unlawful act witnessed by that person.

18. "Safe burglary" means the unlawful taking of:

a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

b. A safe or vault from inside the "premises".

19. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

20. "Theft" means the unlawful taking of "money", "securities" or "other property" to the deprivation of the insured.

© ISO Properties, Inc., 2001

CR 00 22 07 02

**EXHIBIT 2**

CONFIDENTIAL

USF000336

21. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

a. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

b. By means of written instructions (other than those described in Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

22. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

© ISO Properties, Inc., 2001

**EXHIBIT 2**

CONFIDENTIAL

USF000337

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

IL P 001 01 04         © ISO Properties, Inc., 2004         **Page 1 of 1**

**EXHIBIT 2**

CONFIDENTIAL         USF000338

Endorsement # 1 Effective July 19, 2006 Attached to and forming a part of Policy # 626-030403-3
issued to Vesta Strategies, LLC

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

Paragraphs **A.** and **B.** below apply only to the Commercial Crime Policy and Government Crime Policy.

**A.** Paragraphs **(2)** and **(3)** of the **Cancellation Of Policy** Condition are replaced by the following:

**(2) All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if we cancel for:

**(i)** Nonpayment of premium; or

**(ii)** Discovery of fraud by:

   **i.** Any insured or his or her representative in obtaining this policy; or

   **ii.** You or your representative in pursuing a claim under this policy.

**(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

**(3) All Policies In Effect For More Than 60 Days**

**(a)** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

**(i)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(ii)** Discovery of fraud or material misrepresentation by:

   **i.** Any insured or his or her representative in obtaining this policy; or

   **ii.** You or your representative in pursuing a claim under this policy.

**(iii)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(iv)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(v)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(vi)** A determination by the Commissioner of Insurance that the:

   **i.** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

   **ii.** Continuation of the policy coverage would:

     **(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

     **(ii)** Threaten our solvency.

CR 02 49 11 04        © ISO Properties, Inc., 2004        Page 1 of 2    □

**EXHIBIT 2**

CONFIDENTIAL        USF000339

**(vii)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**(b)** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(i)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(ii)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph **(3)(a)**.

**B.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

**1.** Subject to the provisions of Paragraph **B.2.** below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **B.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the time frames shown in Paragraph **B.1.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

**C.** Under the Commercial Crime Policy, Government Crime Policy and Employee Theft And Forgery Policy, the following is added to the **Valuation – Settlement** Condition:

Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

© ISO Properties, Inc., 2004

CR 02 49 11 04

**EXHIBIT 2**

CONFIDENTIAL

USF000340

**Endorsement # 2** Effective **July 19, 2006** Attached to and forming a part of Policy # **626-030403-3**
Issued to **Vesta Strategies LLC**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# INCLUDE RETROACTIVE DATE FOR NAMED INSURED

This endorsement modifies insurance provided under the Discovery Form version of the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**A. Schedule***

      **Retroactive Date:** July 19, 2005

     * Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations

**B. Provisions**

Paragraph **(1)** of the **Discovery** Condition is replaced by the following:

We will only pay for loss that you sustain through acts committed or events occurring after the Retroactive Date shown in the Schedule and discovered by you:

1. During the policy period shown in the Declarations; or
2. During the period of time provided in the Extended Period To Discover Loss Condition.

**EXHIBIT 2**

CONFIDENTIAL                                                                                                USF000341

Endorsement # 3 Effective July 19, 2006 Attached to and forming a part of Policy # 626-030403-3
Issued to Vesta Strategies LLC

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TAX-DEFERRED EXCHANGE ENDORSEMENT

It is agreed that:

1.  CONDITION E.1.r. is deleted in its entirety and replaced by the following:

    **Ownership of Property; Interests Covered:**

    The property covered under this insurance is limited to property:

    a.  That you own or hold; or

    b.  For which you are legally liable; or

    c.  Held in a financial institution account in a transaction involving you as a qualified intermedi-ary for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031.

    However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

2.  EXCLUSION D.1.a. does not apply to losses involving the "funds" of a "client" while you are acting as a qualified intermediary in a tax-deferred exchange of property for such "client" intended to qualify under In-ternal Revenue Code 1031.

3.  Any loss paid (as well as any fees, costs or expenses incurred by us) as a result of the waiver of Exclusion D.1.a. pursuant to paragraph 2, above, will be subject to all rights of recovery that we may have against you and your partners or "members". You and they, collectively and severally, agree to indemnify us immediately for all such loss, fees, costs and expenses. The foregoing is in addition to any other rights we have under the law or under this policy.

4.  Any payment of loss under this policy involving a transaction intended to qualify as a tax-deferred exchange of property under Internal Revenue Code 1031 is conditioned upon your having complied with the following conditions precedent to coverage:

    a.  A written contractual agreement will be maintained between you as intermediary and each "client" stipu-lating the manner in which proceeds from the relinquished property will be held and subsequently re-leased by you as intermediary for use in acquiring replacement property.

    b.  Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from your operating "funds", and each single exchange transac-tion shall be identified by a specific file number or similar tracking identification so as to provide a clear paper trail for each exchange transaction or series of related exchange transactions.

    c.  Countersignature will be required for the release of all "funds" or a monthly reconciliation of all accounts involving exchange transaction proceeds will be performed within two weeks of receipt of the account statement. Those reconciliations must be performed by an individual not authorized to deposit, withdraw or transfer funds from the account or be reviewed by an outside CPA.

**EXHIBIT 2**

CONFIDENTIAL

USF000342

**United States Fire Insurance Company**
**A Delaware Corporation**
**Home Office: Wilmington, DE**

(A Capital Stock Company)

SIGNATURE

Joseph F. Braunstein, Jr.
President

SIGNATURE

Valerie J. Gasparik
Secretary

FM 206.0.11  07 04

**EXHIBIT 2**

CONFIDENTIAL

USF000343

# EXHIBIT 3



MURPHY
HOURIHANE

June 1, 2009

VIA FACSIMILE AND FEDERAL EXPRESS

Mr. Juan J. Trillo
Crum & Forster
305 Madison Avenue
P.O. Box 1960
Morristown, NJ 07962-1960

  Re: United States Fire Insurance Company Policies
    No. 626-030096-4 and 626-030403-3

Dear Mr. Trillo:

We represent Vesta Strategies in regard to the inquiry in your letter of May 28, 2009. Enclosed with this letter is a letter of direction from Vesta accepting the rescission of and refund of the policy premiums for the subject policies. Pursuant to Vesta's instructions, the refund may be paid by check payable to "Murphy & Hourihane, L.L.C." or by wire to:

  Murphy & Hourihane, L.L.C.
  Routing number: ███████  Redacted per FRCP 5.2
  Account number: ███████
  Swift: HATRUS44
  Harris, N.A.
  110 E. Irving Park Rd.
  Roselle, IL 60172

Please contact me as soon as possible to confirm disbursement of the funds. If you have any questions, please feel free to contact me for further information.

    Sincerely yours,

    John N. Hourihane, Jr.

JNH/lah
Enclosures

Murphy & Hourihane, LLC
Attorneys at Law
77 West Wacker Drive, Suite 4800  Chicago, Illinois 60601
T: 312.606.9300  F: 312.606.8765  www.mhlitigation.com

**EXHIBIT 3**

June 1, 2009

Mr. Juan J. Trillo
Crum & Forster
305 Madison Avenue
P.O. Box 1960
Morristown, NJ  07962-1960

   Re: United States Fire Insurance Company Policies
     No. 626-030096-4 and 626-030403-3

Dear Mr. Trillo:

I am the manager of Vesta Strategies, LLC.  In response to the inquiry in your letter of May 28, 2009, Vesta accepts the rescission of the subject policies and refund of the premiums related thereto.  The refund should be paid to our counsel in this matter by check or wire transfer payable to "Murphy & Hourihane, L.L.C."  Thank you for your prompt attention to this matter.

     Sincerely yours,

     Vesta Strategies, LLC
     John Terzakis
     Its: Manager

**EXHIBIT 3**

# EXHIBIT 4

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8                          SAN FRANCISCO DIVISION

9    United States Fire Ins. Co.,                NO. C 09-02388 JW

10                    Plaintiff,          **ORDER DENYING PLAINTIFF'S**
                                          **MOTION TO DISMISS COUNTERCLAIM**
        v.

11

12   Vesta Strategies, LLC,

13                    Defendant.
     _____/

14   Thomas Dillon,

15                    Counter-Claimant,

16      v.

17   United States Fire Ins. Co.,

18                    Counter-Defendant.
     _____/

19                            **I.  INTRODUCTION**

20          United States Fire Insurance Company ("Plaintiff") brings this diversity action against Vesta

21   Strategies, LLC ("Defendant" or "Vesta") seeking rescission and declaratory relief.  Plaintiff alleges

22   that Defendant accepted Plaintiff's rescission and seeks a judgment confirming its validity.  On

23   October 29, 2010, Thomas Dillon ("Counter-Claimant"), acting as receiver for Defendant, filed a

24   Counterclaim against Plaintiff alleging causes of action for declaratory judgment, breach of contract

25   and fraudulent conveyance.

26

27

28

**United States District Court**
For the Northern District of California

**EXHIBIT 4**

1  Presently before the Court is Plaintiff's Motion to Dismiss the Counterclaim.[1]  The Court

2  conducted a hearing on June 20, 2011.  Based on the papers submitted to date and oral argument, the

3  Court DENIES Plaintiff's Motion to Dismiss.

## II.  BACKGROUND

5  In a Counterclaim[2] filed on October 29, 2010, Counter-Claimant alleges as follows:

6  Vesta acted as a qualified intermediary under Section 1031 of the Internal Revenue

7  Code.[3]  (Counterclaim ¶ 26.)  John Terzakis ("Terzakis") and Robert Estupinian

8  ("Estupinian") owned Vesta.  (Id. ¶¶ 9, 11.)  Peter Ye ("Ye") acted as Vice President of

9  Operations at Vesta and managed the bank accounts where exchange funds were deposited.

10  (Id. ¶ 14.)  The Court appointed Counter-Claimant as receiver for Vesta on December 16,

11  2009.  (Id. ¶ 6.)

12  Plaintiff issued two commercial crime policies to Vesta: (1) a policy that ran from

13  August 19, 2005 to August 19, 2006; and (2) a policy that ran from July 19, 2006 to July 19,

14  2007 (collectively "the Policies").[4]  (Counterclaim ¶ 8.)  The Policies contain largely

15  identical terms.  The Policies state that "[w]e[5] will pay for loss of or damage to 'money',

---

17  [1]  (United States Fire Insurance Company's Notice of Motion and Motion to Dismiss for
   Failure to State a Claim Upon Which Relief Can be Granted, hereafter, "Motion," Docket Item No.
18  201.)

19  [2]  (Answer to First Amended Complaint Against Vesta Strategies, LLC ("Vesta") and
   Vesta's Counterclaim for: 1. Declaratory Judgment; 2. Breach of Contracts; 3. Set Aside of
20  Fraudulent Conveyances, hereafter, "Counterclaim," Docket Item No. 194.)

21  [3]  Section 1031 permits owners of investment property to defer capital gains taxes that would
   otherwise be due upon sale of the property by reinvesting the proceeds in substitute investment
22  property.  (Counterclaim ¶ 21.)  In a typical Section 1031 exchange, an exchanger sells a parcel of
   real property and the funds are held in trust by a qualified intermediary while substitute investment
23  property is located and purchased.  (Id. ¶ 22.)

24  [4]  The Policies are attached to Plaintiff's First Amended Complaint filed on June 10, 2009.
   (First Amended Complaint for Rescission and Declaratory Relief, hereafter, "FAC," Docket Item
25  No. 5, Exs. A, B.)

26  [5]  The Policies state that "'we,' 'us' and 'our' refer to the Company providing the insurance,"
   i.e., Plaintiff.  (FAC, Ex. A at 3, Ex. B at 3.)  The Policies state that "'you' and 'your' refer to the
27  Named Insured shown in the Declarations," i.e., Defendant and Counter-Claimant.  (Id.)

28

**EXHIBIT 4**

United States District Court

For the Northern District of California

'securities' and 'other property' resulting directly from 'theft' committed by an 'employee', whether identified or not, acting alone or in collusion with other persons." (FAC, Ex. A at 4, Ex. B at 4.) The Policies exclude from coverage "[l]oss resulting from 'theft' or any other dishonest act committed by: (1) You; or (2) Any of your partners or 'members'; whether acting alone or in collusion with other persons." (Id., Ex. A at 4, Ex. B at 4.) However, a Tax-Deferred Exchange Endorsement to the Policies states that this exclusion "does not apply to losses involving the 'funds' of a 'client' while you are acting as a qualified intermediary in a tax-deferred exchange of property for such 'client' intended to qualify under Internal Revenue Code 1031." (Id., Ex. A at 16, Ex. B at 18.) The Policies are limited to "loss that you sustain through acts committed or events occurring at any time and discovered by you: (a) During the policy period shown in the Declarations; or (b) During the period of time provided in the Extended Period to Discovery Loss Condition E.1.j."[6] (Id., Ex. A at 7, Ex. B at 7.) "Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known." (Id.)

Terzakis and Estupinian stole exchange funds deposited with Vesta during the discovery period for the Policies issued by Plaintiff. (Counterclaim ¶ 5.) After taking the funds, Terzakis and Estupinian ran a "Ponzi scheme" by using funds from new exchangers to pay off older exchangers whose funds they had previously misappropriated. (Id. ¶¶ 25-38, 53.) The scheme collapsed in July 2008 when the real estate market cooled. (Id. ¶ 38.) Terzakis and Estupinian were indicted on conspiracy, fraud and money laundering charges on December 30, 2009. (Id., Ex. 1.) Ye was charged with fraud and money laundering in an information filed on January 19, 2010. (Id., Exs. 2-3.) Vesta did not notify Defendant of the

---

[6] Provision E.1.j extends the discovery period for 60 days beyond the policy period for most losses and by one year for losses related to employee benefit plans. (FAC, Ex. A at 7-8, Ex. B at 7-8.)

**EXHIBIT 4**

United States District Court
For the Northern District of California

thefts during the discovery period because it was controlled by Terzakis and Estupinian, the parties that caused the loss. (Id. ¶¶ 55-56.) Terzakis and Estupinian's ownership of Vesta constituted adverse domination that tolled the time for discovering a loss and making a claim until Counter-Claimant was appointed receiver. (Id.)

On or about February 13, 2009, Samuel Henka (a Vesta Exchanger) submitted a claim to Plaintiff seeking payment and outlining the embezzlement of exchange funds by Terzakis and Estupinian. (Counterclaim ¶ 68.) On June 1, 2009, Plaintiff entered into an agreement with Terzakis to return the premium on the Policies in exchange for the rescission of the $2 million dollar policies. (Id.) The payment of the premiums in exchange for the rescission was a fraudulent conveyance made without adequate consideration and with the intent by Terzakis and Plaintiff to hinder creditors. (Id. ¶ 69.)

On the basis of the allegations outlined above, Counter-Claimant alleges three causes of action: (1) Declaratory Judgment; (2) Breach of Contract; and (3) Fraudulent Conveyance.

Presently before the Court is Plaintiff's Motion to Dismiss.

### III. STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief may be granted. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Any existing ambiguities must be resolved in favor of the pleading. Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973). However, mere conclusions couched in factual allegations are not sufficient to state a cause of action. Papasan v. Allain, 478 U.S. 265, 286 (1986); see also McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988). The complaint must plead "enough facts to state a claim for relief that is plausible on its

4

**EXHIBIT 4**

face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Thus, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment. Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

### IV. DISCUSSION

Plaintiff moves to dismiss on the ground that Counter-Claimant did not discover the asserted claims during the discovery period and the adverse domination doctrine does not apply to toll the discovery period. (Motion at 12-13.) Specifically, Plaintiff contends that Terzakis and Estupinian's knowledge of their own wrongdoing is insufficient to constitute "discovery" and that adverse domination does not apply because: (1) other non-wrongdoing employees could have discovered the loss; and (2) Vesta was a mere alter-ego of the wrongdoers, such that application of adverse domination would violate public policy.[7] (Id. at 15-18.) Counter-Claimant responds that Terzakis and Estupinian, and therefore Vesta, "discovered" the losses at the time they occurred and that Plaintiff's attempts to distinguish the adverse domination doctrine fail because: (1) whether non-wrongdoing employees could have discovered the loss must be explored through discovery; and (2) any "alter-ego" exception does not apply because the Policy was intended to benefit Vesta exchangers.[8] The Court addresses each of Plaintiff's contentions in turn.

---

[7] (Motion at 15-18; Reply in Support of United States Fire Insurance Company's Motion to Dismiss at 3, hereafter, "Reply," Docket Item No. 211.)

[8] (Receiver's Opposition to U.S. Fire's Motion to Dismiss the Counterclaim at 4, 9, hereafter, "Opp'n," Docket Item No. 203.)

**EXHIBIT 4**

**A.    Wrongdoer "Discovery"**

At issue is whether Counter-Claimant's allegation that Terzakis and Estupinian knew of the losses caused by their own misappropriation of exchanger funds during the discovery period is sufficient to allege "discovery" under the Policies.

"[U]nder fidelity bond and California law, 'discovery' occurs once an insured becomes aware of facts that would cause a reasonable person to assume a loss had been or would be incurred." Gulf USA Corp. v. Federal Ins. Co., 259 F.3d 1049, 1058 (9th Cir. 2001). "In other words, 'discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts; suspicion of loss is not enough.'" Id. (quoting Cal. Union Ins. Co. v. Am. Diversified Sav. Bank, 948 F.2d 556, 563 (9th Cir. 1991) (emphasis omitted)).

Counter-Claimant alleges in pertinent part:

> The U.S. Fire Enhanced Policies require that a loss giving rise to a claim must be discovered either (I) during the policy period, or (ii) during the period for extended discovery, which is 60 days beyond the cancellation or termination date of the policy.[] The Crime Policies state that "discovery" occurs "when you [the insured] first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred[.]"[] Once a loss is discovered, the insured is required to notify the carrier of the loss "as soon as possible."[]  (Counterclaim ¶ 54 (footnotes omitted).)
>
> Terzakis, Estupinian and Ye became "aware" of the existence of covered losses at each time they embezzled Exchange funds for their own use.  Their awareness of these facts persisted continuously throughout each of the relevant policy periods. (Counterclaim ¶ 55.)

The Policies state in pertinent part:

> f. Discovery
> (1) We will pay for loss that you sustain through acts committed or events occurring at any time and discovered by you:
> (a) During the policy period shown in the Declarations; or
> (b) During the period of time provided in the Extended Period To Discover Loss Condition E.1.j.

**EXHIBIT 4**

United States District Court

For the Northern District of California

(2) Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known. Discovery also occurs when you receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this policy.

(FAC, Ex. A at 7, Ex. B at 7.)

Based on the allegations above and the discovery provisions of the Policies, the Court finds that Counter-Claimant has not sufficiently alleged "discovery" under the Policies based on Terzakis and Estupinian's knowledge of their own wrongdoing. Counter-Claimant cites no authority for the proposition that a wrongdoer's knowledge of his or her own bad acts constitutes discovery under a commercial crime policy. Moreover, if an owner's knowledge of his or her own wrongdoing constituted "discovery" under a policy similar to those at issue here, the loss discovery provision would be effectively read out of the contract. Thus, the Court finds that Counter-Claimant's allegations regarding Terzakis and Estupinian's knowledge of their own misappropriation of client funds is not sufficient to allege "discovery" of a compensable loss by Vesta during the discovery period of the Policies.

**B.    Adverse Domination**

At issue is whether the adverse domination doctrine is applicable in the present case, or whether the presence of non-wrongdoing employees who could have discovered the loss or the alter-ego exception to the doctrine preclude its applicability.

Adverse domination is a form of equitable tolling applicable to discovery of loss provisions. Admiralty Fund v. Peerless Ins. Co., 143 Cal. App. 3d 379, 388 (Cal. Ct. App. 1983). Generally, courts strictly enforce discovery of loss provisions "so that neither difficulty in discovering insured losses nor employee concealment excuse the insured's performance." Id. at 384. However, a discovery of loss provision may be equitably tolled when a complaint alleges that "a claim arises from a director's or employee's defalcation and the wrongdoers' control makes discovery impossible . . . ." Id. at 387. In Admiralty, a mutual fund sued its insurance carrier for refusing to cover losses under a fidelity insurance contract that were caused by the wrongdoing of the mutual

7

**EXHIBIT 4**

United States District Court

For the Northern District of California

1    fund's president and other high ranking officers.  Id. at 381-82, 389.  On appeal, the plaintiffs

2    contended that the discovery period of the policy should have been equitably tolled because the

3    wrongdoing parties adversely dominated the company to such an extent that non-wrongdoing

4    employees could not have discovered the loss.  Id. at 383.  The California Court of Appeal

5    recognized that "[a] mutual fund is a 'mere shell,' a pool of assets consisting mostly of portfolio

6    securities that belongs to the individual investors holding shares in the fund."  Id. at 388 (quoting

7    Tannenbaum v. Zeller, 552 F.2d 402, 405 (2d Cir. 1977)).  "This near absolute control can place the

8    shareholders of a mutual fund . . . in a position of incapacity, and may make discovery of any

9    wrongdoing impossible."  Id.  Therefore, the court ruled that the discovery period was tolled

10   because the company "could not have discovered the true cause of the losses, that is, the

11   employees' dishonesty, until the wrongdoers relinquished control."  Id.

12       **1.      Discovery by Non-Wrongdoing Employees**

13       Plaintiff contends that adverse domination does not apply because, according to the

14   Counterclaim, Ginny Estupinian, President of Vesta and allegedly a non-wrongdoing employee,

15   was involved in "important corporate activities as [sic] procuring insurance," and therefore could

16   have discovered the loss during the discovery period.  (Motion at 15.)  Counter-Claimant responds

17   that there is insufficient evidence available to support or dispute Plaintiff's contention, which must

18   be explored through discovery.  (Opp'n at 9.)

19       The Ninth Circuit has refused to apply adverse domination where it was "not controverted

20   that there were non-wrongdoing employees who could have discovered the losses prior to

21   takeover."  Cal. Union Ins. Co., 948 F.2d at 565.

22       Here, Counter-Claimant alleges in pertinent part:

23           Terzakis and Estupinian (the "Thieves") first began working together in
         approximately March 2000, at which time they discovered the existence of the unregulated
24           business of 1031 Exchange Accommodators, whereby large sums of money were held in
         trust for up to 180 days.  With rising real estate prices, new escrows being opened on
25           relinquished properties were sufficient to pay for the close of escrows on replacement
         properties, thus enabling them to divert Exchange Funds held in trust without detection by
26           the Exchangers.  (Counterclaim ¶ 25.)
             The Thieves formed Vesta in January 2004 to act as a QI for purposes of 1031
27           exchanges to enable them to engage in a pattern of self-dealing and misappropriation of

28                                                    8

**EXHIBIT 4**

client trust assets. Other than Ye, Terzakis, and Estupinian, the employees at Vesta were unaware of the theft of Exchange Funds. Terzakis and Estupinian controlled the financial affairs of Vesta and exercised dominion over Vesta which incapacitated Vesta and precluded non-wrongdoing employees from discovering their crimes. (Counterclaim ¶ 26.)

Terzakis and Estupinian were able to hide their ongoing theft of Exchange Funds through the constant manipulation and transfer of funds from newer clients to older clients. As long as the new escrows on "relinquished" properties were sufficient to pay for the close of escrow on "replacement' [sic] properties, Terzakis and Estupinian could conceal their theft and cover up the deficit in Vesta's client trust account. (Counterclaim ¶ 53.)

Ginny Estupinian was employed by Vesta as its President and executed the applications for insurance for the two U.S. Fire Enhanced Policies. Ginny Estupinian has not been indicted or charged by the government for any crimes arising out of her employment at Vesta. In late 2007, Ginny Estupinian was sued by Terzakis for allegedly participating in the conversion of Exchange Funds with her husband. In response, Ginny Estupinian filed a counterclaim against Terzakis accusing Terzakis of the embezzlement of Exchange Funds. The date when Ginny Estupinian, as the President of Vesta, discovered the embezzlement of Exchange Funds by either Terzakis or Estupinian is uncertain. Regardless of the date when she discovered the embezzlement, once discovered, she acted adverse to Vesta to protect her husband. In late 2007, Ginny Estupinian was fired as the President of Vesata [sic] by Terzakis and escorted by security from the Vesta office in San Jose. (Counterclaim ¶ 16.)

Based on the allegations above and the discovery provisions of the Policies, the Court finds that the Counterclaim alleges sufficient facts to establish that non-wrongdoing employees at Vesta could not have discovered the embezzlement of funds by Terzakis and Estupinian. Significantly, Counter-Claimant alleges that Terzakis and Estupinian "exercised dominion over Vesta which incapacitated Vesta and precluded non-wrongdoing employees from discovering their crimes." (Counterclaim ¶ 26.) Although Ginny Estupinian was allegedly President of Vesta during the time at issue, Counter-Claimant further alleges that it is uncertain when she discovered the thefts and that she acted adverse to Vesta's interests when that discovery ultimately occurred. At this stage, such allegations are sufficient to establish that no non-wrongdoing employee of Vesta could have discovered the embezzlement during the discovery period. Plaintiff's dispute of these allegations is more appropriate to a motion for summary judgment.

Plaintiff's reliance on <u>California Union</u> and <u>Gray & Associates</u> for the principle that the adverse domination doctrine does not apply in this case due to the presence of non-wrongdoing employees is misplaced. (Motion at 15.) In <u>California Union</u>, the parties did not dispute that non-wrongdoing employees could have discovered the losses prior to the defendant bank's takeover by the Federal Savings and Loan Insurance Corporation. 948 F.2d at 565. In <u>Gray & Associates</u>, the

9

**EXHIBIT 4**

1  court determined on summary judgment that "[a]s of December 2004, there was ample evidence

2  available to [the receiver] Gray . . . that funds may have been misappropriated" and therefore it was

3  "simply unreasonable that Gray claims it did not discover the loss until January 2006." Gray &

4  Assocs., LLC v. Travelers Cas. & Sur. Co., No. CCB-07-2216, 2008 WL 822130, at *5 (D. Md.

5  Mar. 25, 2008).  By contrast, Counter-Claimant alleges that Terzakis and Estupinian exercised

6  complete control over Vesta and that no non-wrongdoing employees could have discovered the loss

7  until Counter-Claimant was appointed as receiver.  (Counterclaim ¶¶ 55-56.)

8       Accordingly, the Court DENIES Plaintiff's Motion to Dismiss on the issue of potential

9  discovery of the loss by non-wrongdoing employees.

10 **C.**     **Alter-Ego Exception and Public Policy**

11      Plaintiff contends that the adverse domination doctrine does not apply because Vesta is

12 merely the alter-ego of the wrongdoers.  (Motion at 14-15.)  In particular, Plaintiff contends that the

13 alter-ego "exception" to adverse domination applies because: (1) the sole shareholders have

14 unclean hands and there are no minority shareholders to protect; and (2) it is contrary to public

15 policy to permit Vesta's alter-egos to profit from their own wrongdoing.  (Id.)  Counter-Claimant

16 responds that the issues raised by Plaintiff must be explored through discovery.  (Opp'n at 9.)

17      Courts have recognized that the purpose of the adverse domination doctrine is not served

18 where there are no minority interests such as shareholders or innocent investors to protect.  See J.I.

19 Corp. v. Federal Ins. Co., 920 F.2d 118, 119 (1st Cir. 1990); In re REA Exp., Inc., 412 F. Supp.

20 1239, 1257 n.45 (E.D. Pa. 1976); In re Payroll Exp. Corp., 216 B.R. 344, 359-60 (S.D.N.Y. 1997).

21 More generally, the California Insurance Code states that a carrier "is not liable for a loss caused by

22 the wilful act of the [policy holder]; but [it] is not exonerated by the negligence of the [policy

23 holder], or of the [policy holder's] agents or others."  Cal. Ins. Code § 533.  Section 533 codifies

24 the maxim that "[t]he basic function of the court is to see that no one takes advantage of his own

25 wrong."  Erlin-Lawler Enters., Inc. v. Fire Ins. Exch., 267 Cal. App. 2d 381, 385 (Cal. Ct. App.

26 1968).  The Ninth Circuit has interpreted this principle to find that a principal officer and director

27

28

*United States District Court*
For the Northern District of California

**EXHIBIT 4**

United States District Court
For the Northern District of California

1    of a company cannot constitute an "employee" for purposes of a standard commercial crime policy.

2    Cal. Union Ins. Co., 948 F.2d at 566.

3           In this case, the general policy that one should not be permitted to take advantage of his or

4    her own wrong is not implicated by Counter-Claimant's adverse domination allegations.  Should

5    Counter-Claimant receive funds under the Policies for loss caused by Terzakis and Estupinian,

6    Counter-Claimant is charged with maintaining a common fund for the payment of Vesta's creditors,

7    including the exchangers from whom Terzakis and Estupinian stole.[9]  Thus, the Court finds that

8    allowing recovery in this case will not provide Terzakis and Estupinian with the opportunity to take

9    advantage of their own wrongdoing.[10]

10          Plaintiff's authority interpreting the meaning of "employee" for purposes of a standard

11   commercial crime policy does not alter the Court's findings.  In California Union, the Ninth Circuit

12   held that the principal officers and directors of the defendant bank did not constitute "employees"

13   as that term was defined in a fidelity insurance contract, in part due to the "public policy against

14   permitting a corporation to collect insurance for the defalcations of its alter ego."  948 F.2d at 566

15   (citing Kerr v. Aetna Cas. & Sur. Co., 350 F.2d 146, 154-55 (4th Cir. 1965)).  Unlike the policy in

16   California Union, the Tax-Deferred Exchange Endorsement of the Policies at issue expressly covers

17   losses resulting from dishonest acts of the insured, Vesta, or its partners, Terzakis and Estupinian,

18   involving Section 1031 exchange funds.  As a result, in this case, any embezzlement of Section

19   1031 exchange funds by company principles was expressly covered by the Policies.

20          Accordingly, the Court DENIES Plaintiff's Motion to Dismiss on the issue of the alter-ego

21   exception to the adverse domination doctrine.

22

23

_____

24   [9] (Order Granting Motion to Appoint Receiver; Order Appointing Receiver at 3, Docket
     Item No. 123.)

25

26   [10] Notably, however, there remains a factual issue to be resolved as to whether the Section
     1031 exchangers involved in this case are analogous to the shareholders aggrieved in Admiralty

27   such that application of the adverse domination doctrine is appropriate.  The Court reserves a deeper
     inquiry on this issue for summary judgment.

28
                                                11

**EXHIBIT 4**

**V.  CONCLUSION**

The Court DENIES Plaintiff's Motion to Dismiss.

On **September 19, 2011 at 10 a.m.**, the parties shall appear for a Case Management Conference.  On or before **September 9, 2011**, the parties shall file a Joint Case Management Statement.  The Statement shall include, *inter alia*, a good faith proposed schedule as to how this case should proceed.

Dated:  July 14, 2011

_____
JAMES WARE
United States District Chief Judge

12

**EXHIBIT 4**

United States District Court
For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Eileen King Bower eileen.bower@troutmansanders.com
Brian Patrick Cummings brian.cummings@troutmansanders.com
John R. Gerstein jack.gerstein@troutmansanders.com
Becki F. Kieffer becki.kieffer@troutmansanders.com
Robert Louis Brace rlbrace@hbsb.com
Peter Laurence Candy plcandy@hbsb.com
Michael P. Denver mpdenver@hbsb.com
Andrew B. Downs andy.downs@bullivant.com
Peter Roldan peter.roldan@bullivant.com
Norman Jorgen Ronneberg, Jr norman.ronneberg@bullivant.com
Erik Fuehrer erik.fuehrer@dlapiper.com
Michael Gerald Schwartz michael.schwartz@dlapiper.com
Patric J. Kelly pjkelly@ahk-law.com
Kevin Richard Martin kevin@pattonmartinsullivan.com
Shawn Robert Parr shawn@parrlawgroup.com
James David Roberts jroberts@chennelsonroberts.com
Charles Edward Wheeler cwheeler@cozen.com

**Dated:  July 14, 2011**                     **Richard W. Wieking, Clerk**


                                              **By:    /s/ JW Chambers        **
                                                    **Susan Imbriani**
                                                    **Courtroom Deputy**

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

**EXHIBIT 4**